WAPELLA EDUCATION ASSOCIATION, IEA-NEA, Petitioner, v. ILLI-
NOIS EDUCATIONAL LABOR RELATIONS BOARD et al., Respondents.

Fourth District   No. 4—87—0409

Opinion filed December 15, 1988.

154

Gregory J. Malovance and Richard H. Winters, both of Winston & Strawn, of Chicago, and Sandra Holman, of Illinois Education Association, of Springfield, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield, and Randi Hammer Abramsky, of Illinois Educational Labor Relations Board, of Chicago (Shawn W. Denney, Solicitor General, and Imelda R. Terrazino, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Educational Labor Relations Board.

John T. Taylor, Merry C. Rhoades, and Philip H. Gerner III, all of Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., of Decatur, for respondent Wapella Community Unit School District No. 5.

JUSTICE SPITZ delivered the opinion of the court:

In July 1985 the board of education of respondent, Wapella Community Unit School District No. 5 (district), rescinded its policy granting full credit, for purposes of placement on the salary schedule, for service in other school districts. In August 1985, the district hired a teacher and placed her on the salary schedule with credit for only five years' service where the teacher had more than five years of service in other school districts. In March 1986, petitioner Wapella Education Association (Association) filed a charge against the district, alleging violations of sections 14(a)(1) and (a)(5) of the Illinois Educational Labor Relations Act (Act) (Ill. Rev. Stat. 1985, ch. 48, pars. 1714(a)(1), (a)(5)), in that:

"Since on or about September 10, 1985, and continuing to date, the above named Employer, *** has failed and refused and continues to fail and refuse to bargain in good faith with the Charging Party, *** as the exclusive representative of its certified teachers, by [1] unilaterally changing, without prior notice and bargaining in good faith to impasse, employee Phyllis M. Hale's salary under the current collective bargaining agreement; [and 2] unilaterally changing its policy regarding outside teach-

ing credit for members of the bargaining unit.

Since on or about October 21, 1985, and continuing to date the above named Employer *** has failed and refused and continues to fail and refuse to bargain upon request with the Charging Party regarding unilateral changes in [1] employee Hale's salary under the current contract and [2] changes in Employer's policy regarding outside teaching credit."

Sections 14(a)(1) and (a)(5) provide:

"(a) Educational employers, their agents or representatives are prohibited from:

(1) Interfering, restraining or coercing employees in the exercise of the rights guaranteed under this Act.

* * *

(5) Refusing to bargain collectively in good faith with an employee representative which is the exclusive representative of employees in an appropriate unit, including but not limited to the discussing of grievances with the exclusive representative ***." (Ill. Rev. Stat. 1985, ch. 48, pars. 1714(a)(1), (a)(5).)

A complaint issued but was thereafter dismissed, the Illinois Educational Labor Relations Board (IELRB) holding that the charge was not timely filed under section 15 of the Act because the violation did not occur within the six months preceding the filing of the charge (Ill. Rev. Stat. 1985, ch. 48, par. 1715). (*Wapella Education Association, IEA-NEA*, 3 Pub. Employee Rep. (Ill.) par. 1056, case No. 86—CA—0011—S (Illinois Educational Labor Relations Board, May 14, 1987) (Wapella Community Unit School District No. 5).) This appeal followed.

I

The district and the Association were parties to a collective-bargaining agreement covering all certified classroom teachers, effective August 1, 1984, to July 31, 1985. On July 31, 1985, a successor agreement, effective August 1, 1985, to July 31, 1986, was signed. As found by the IELRB: .

"Neither the 1984-85 or 1985-86 agreement contained provisions relating to rescission of Board policy or credit for service in other districts. Provision 9.1 in each agreement regarding compensation merely states ***:

'9.1 Teachers shall be compensated by the Board for their services according to their placement on the salary schedule *** as certified by the Superintendent and their assigned extracurricular duties ***. Payment will be made in twenty-four (24) equal installments.' " (*Wapella*, 3 Pub. Employee Rep.

(Ill.) par. 1056, at VII—161 n.5.)

The parties' collective-bargaining agreements included a zipper clause, which stated:

"11.1 The terms and conditions set forth in this Agreement represent the full and complete understanding between the parties. The terms and conditions may be modified only through the written mutual consent of the parties.

\*\*\*

11.3 The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law or by specific agreement of the parties, and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the School District and the Association, for the life of this Agreement, each voluntarily and unqualifiedly waives any right which might otherwise exist under law, practice, or custom to negotiate over any matter during the term of this Agreement, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter referred to, or covered in this Agreement or with respect to any subject or matter not specifically referred to or covered in this Agreement, even though such subject or matter may not have been within the knowledge or contemplation of either or both of the parties at the time that they negotiated or signed this Agreement."

See *Wapella*, 3 Pub. Employee Rep. (Ill.) par. 1056, at VII—157.

At a meeting on July 17, 1985, the district's board of education voted to rescind its policy on teacher placement on the salary schedule and credit for teaching experience in the other schools. This policy had stated:

" 'Service in other districts will be given full credit on the salary schedule.' " (*Wapella*, 3 Pub. Employee Rep. (Ill.) par. 1056, at VII—157 (quoting article IV, section F, 7(d)).)

After the rescission of the policy, Ms. Hale, a teacher, interviewed for a third-grade teaching position in the district. Hale calculated her credit for previous teaching experience as 13.5 years, or, after subtracting her substitute teaching, as 11 years. Initially, the superintendent and principal did not want to give Hale credit for her master's degree since it was in home economics education, rather than elementary education. They offered the position to Hale if she agreed to be placed on the salary schedule at a bachelor's degree plus 24 (the step

below the master's degree), with credit for five years' teaching experience.

On or about July 22 or 23, 1985, Association copresident Bowman met with the district's superintendent and told him the Association was concerned about the district's rescission of policy at the July 17, 1986, board meeting, asserting that the district's action might be a violation of its duty to bargain under the Act. The superintendent took the position that prospective employees for the 1985-86 school year were not affected by the collective-bargaining agreement between the district and the Association.

On July 29, 1985, Bowman, as the Association's copresident, wrote to the superintendent of schools requesting that the district's board reconsider its change in policy and reinstate its former policy on experience credit.

At a meeting of the board of education on July 31, 1985, the superintendent read Bowman's letter of July 29 to the board. Bowman spoke to the board, expressing the Association's concern and belief that the board may have violated the Act. The board took no action to reverse the July 17 rescission of the policy. At the same meeting, the board voted to employ Hale for the 1985-86 school year as a third-grade teacher with credit for five years' teaching experience and a master's degree. The board also ratified its 1985-86 agreement with the Association, and the parties signed it.

On August 1, 1985, Hale was informed of the offer of employment and told she would receive credit for her master's degree. Later that day, Hale signed an individual contract with the district, which included a specific clause on credit for past teaching experience: "For purposes of establishing initial teaching salary, the School District recognizes 5 years of past teaching experience and a Master's Degree + 0 hours credit."

On August 6, 1985, the superintendent of schools by letter advised the Association that the board of education was not going to reverse its action of July 17, 1985.

The district's teachers started work for the 1985-86 school year on August 21, 1985. During the first week of school the Association learned that Hale was not given credit for all of her teaching experience.

The Association held a general business meeting the first week after Labor Day, September 2 through 6. Hale was present at the meeting and her situation was discussed.

On September 10, 1985, district employees, including Hale, received their first paychecks for the 1985-86 school year.

On October 2, 1985, the Association by letter requested that the board of education bargain on its action of July 17, 1985.

On October 21, 1985, the board of education by letter denied the request to negotiate rescission of its policy, asserting (1) section 10–20.7 of the School Code (Ill. Rev. Stat. 1985, ch. 122, par. 10–20.7) designated the appointment of teachers and setting of salaries as the responsibility of the board of education, and (2) its authority to handle these matters was preserved in article III of the collective-bargaining agreement (board authority and management rights); and denying (3) that the policy change affected working conditions of members of the bargaining unit, since the change related to circumstances under which prospective teachers would be employed. Further, the district stated the language of article XI, section 11.3, of the labor contract, "the zipper clause," showed the parties' agreement that, for the term of the collective-bargaining contract, neither party was obligated to bargain over any subject matter.

On March 6, 1986, the Association filed its charge with the IELRB.

In April 1986, the parties began bargaining for the successor agreement for the 1986-87 school year. The Association proposed adding clauses on changing existing board policy and procedures and on calculating teachers' placement on the salary schedule. At the time of the IELRB hearing, the parties were still bargaining and these issues had not been resolved.

## II

The crux of this case is the point in time from which the statutory limit is measured: (1) the conduct of the district in rescinding its policy of full credit on the salary schedule for teaching experience in other districts, *i.e.*, the announcement of a unilateral change—the position taken by the IELRB and the respondent district; or (2) implementation of the new policy in paychecks of September 10, 1985, and the district's written refusal on October 21, 1985, to bargain over the rescission of the policy on July 17, 1985—as argued by the Association.

In proceedings before the IELRB, the district argued (1) the charge was not timely filed; (2) it had no duty to bargain as the subject is a matter of inherent managerial policy; (3) it had no duty to engage in midterm bargaining but, if it did, the Association waived its right to midterm bargaining when it agreed to the zipper clause; and (4) it has no duty to bargain the *impact* of the policy decision, since the Association failed to request impact bargaining. *Wapella*, 3 Pub. Employee Rep. (Ill.) par. 1056, at VII—159.

The Association argued it neither knew nor had reason to know that an unfair labor practice fully occurred until September 10, 1985, when the employees received their paychecks since, prior to that date, it did not know specifically how the change in policy was to be implemented. The Association further asserted the district's alleged unlawful acts constituted a continuing violation, *i.e.*, placement on the salary schedule and credit for previous teaching service are mandatory subjects of bargaining, and it did not waive its midterm bargaining rights by the zipper clause in the 1985-86 bargaining agreement.

The IELRB found the charge untimely, stating:

> "In *Chicago Board of Education*, 2 PERI 1089, Case No. 84—CA—0087—C, (IELRB Opinion and Order, June 24, 1986), we held that this six-month period '*** does not begin to run until the Charging Party or the party adversely affected by the alleged wrong knows or has reason to know that an unfair labor practice has occurred.' In other words, the unfair labor practice charge must be filed within six months of the time the charging party was put on notice, actual or constructive, of the unlawful conduct.

> Applying this principle in the context of a charge alleging a unilateral change in terms and conditions of employment, the limitations period begins to run when the charging party becomes aware of or should have become aware of the change at issue—in this case, the District's rescission of its policy granting full credit for past teaching service. Usually, that time will be the date the change is unambiguously announced, not the date the change is implemented. This is because the alleged unfair labor practice is the unilateral change in policy—not its application per se. The date of implementation, therefore, is merely the date the allegedly unlawful change is first applied. Yet, it is knowledge of the allegedly unlawful act itself, not its precise or ultimate consequences, that triggers the start of the limitation period." (*Wapella*, 3 Pub. Employee Rep. (Ill.) par. 1056, at VII—160.)

The IELRB referenced the various facts supporting its conclusion that the charge was untimely filed. The IELRB further rejected the Association's claim that the violation was a continuing one, stating:

> "Moreover, we reject [the Association's] contention that its charge is timely because the alleged unlawful conduct constituted a continuing violation. That position is based on the premise that each instance the new policy is implemented, *i.e.*, the teacher receives a paycheck which does not reflect credit for

prior teaching experience outside the District, constitutes a separate violation. However, payment in accordance with the new policy could only be understood as improper on the assumption that the rescission of the policy was unlawful. (*Cf. Paper Products and Miscellaneous Chauffeurs, Warehousemen & Helpers, Local 27* [aff/w IBT (S.L. Wyandach Corp. d/b/a Combined Container Industries) (1974), 209 NLRB 883 (1974), 85 L.R.R.M. 1473]." *Wapella*, 3 Pub. Employee Rep. (Ill.) par. 1056, at VII— 160.

### III

■■ ■ On administrative review, the findings and conclusions of the administrative agency on questions of fact shall be held to be *prima facie* true and correct. (Ill. Rev. Stat. 1985, ch. 110, par. 3— 110.) Although the reviewing court will not set aside an agency's finding of fact, it is nevertheless not bound by the agency's conclusions of law. (*Danison v. Paley* (1976), 41 Ill. App. 3d 1033, 355 N.E.2d 230.) As a general rule, courts will accord deference to the interpretation placed on a statute by the agency charged with its administration. An administrative agency's interpretation is not binding, however, and it will be rejected when it is erroneous. (*City of Decatur v. AFSCME, Local 268* (1988), 122 Ill. 2d 353, 361, 522 N.E.2d 1219, 1222.) Decisions of the National Labor Relations Board (NLRB) and the Federal courts interpreting similar provisions under the Labor Management Relations Act, 1947 (LMRA) (29 U.S.C. §141 *et seq.* (1982)) are persuasive authority, as are the decisions of our sister States interpreting comparable statutory provisions, but the IELRB is not bound to interpret the Act as the NLRB or Federal courts have interpreted the LMRA. *East Richland Education Association, IEA-NEA v. Illinois Educational Labor Relations Board* (1988), 173 Ill. App. 3d 878, 902, 528 N.E.2d 751, 765.

As the charge here was filed on March 6, 1986, the six-month period for filing the complaint extended back to September 6, 1985. According to the factual findings of the IELRB, it was during the first week of the school year, at the end of August 1985, that the Association learned Hale had not been given credit for all of her teaching experience in other districts. In *Chicago Board of Education*, 2 Pub. Employee Rep. (Ill.) par. 1089, case No. 84—CA—0087—C (Illinois Educational Labor Relations Board, June 24, 1986), the IELRB applied the discovery rule and cited Federal precedent for its application to time limits for the filing of unfair labor practice charges, citing *Farr v. H.K. Porter Co.* (5th Cir. 1984), 727 F.2d 502, 115 L.R.R.M.

3606, and *Benson v. General Motors Corp.* (11th Cir. 1983), 716 F.2d 862, 114 L.R.R.M. 2919. This court affirmed. *Board of Education v. Illinois Educational Labor Relations Board* (1988), 170 Ill. App. 3d 490, 499, 524 N.E.2d 711, 716, *appeal denied* (1988), 122 Ill. 2d 569 (Chicago Teachers Union, Local No. 1).

The Association argues that the statutory limitation period began to run when the district *implemented* its change of policy, on receipt of the teachers' first paychecks for the school year, September 10, 1985. The Association contends the IELRB's interpretation of the time limitation in section 15 of the Act is contrary to both Illinois law, citing such cases as *Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.* (1975), 61 Ill. 2d 129, 334 N.E.2d 160, and *Amman Food & Liquor, Inc. v. Heritage Insurance Co.* (1978), 65 Ill. App. 3d 140, 382 N.E.2d 562, and to decisions of the NLRB and the Federal courts interpreting the time limitation of the LMRA, the proviso to section 10(b) (29 U.S.C. §160(b) (1982)), citing such cases as *Jim O'Donnell, Inc.* (1959), 123 N.L.R.B. 1639, 44 L.R.R.M. 1182, *Swift Service Stores, Inc.* (1968), 169 N.L.R.B. 359, 67 L.R.R.M. 1181, *L.C. Cassidy & Son, Inc.* (1970), 185 N.L.R.B. 920, 75 L.R.R.M. 1260 (Miami Valley Carpenters District Council), and *Plymouth Locomotive Works, Inc.* (1982), 261 N.L.R.B. 595, 110 L.R.R.M. 1155.

■ The IELRB maintains its holding comports with the discovery rule since the alleged unfair labor practice was a unilateral change in a term and condition of employment, so the Association's cause of action accrued when it knew or had reason to know the unilateral change took place.

Section 15 of the Act provides in pertinent part:

> *"No order shall be issued upon an unfair practice occurring more than 6 months before the filing of the charge alleging the unfair labor practice.* If the Board finds that the party charged has not committed any unfair labor practice, findings of fact shall be made and an order issued dismissing the charges." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 48, par. 1715.)

The comparable time limitation for filing a charge under the LMRA is found in the proviso of section 10(b), which states in pertinent part:

> *"Provided,* That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the [NLRB] and the service of a copy thereof upon the person against whom. such charge is made ***." 29 U.S.C. §160(b) (1982).

A leading treatise on labor law offers the following general explanation of the section 10(b) proviso of the LMRA and its application:

"The [NLRB] may not issue a complaint based upon conduct occurring more than six months before filing and service of the charge. The six-month limitation period may be tolled where the charging party does not have actual or constructive knowledge of the unfair labor practice or where the unlawful conduct is of a continuing nature. And where a respondent engages in fraudulent concealment and deception as to its unlawful conduct, the [NLRB] may find the six-month statute of limitations tolled, both as to the filing of the charge and as to the remedy." 2 C. Morris, The Developing Labor Law 1616-17 & nn.113, 115 through 119 (2d ed. 1983).

The IELRB cites the decision in *United States Postal Service Marina Mail Processing Center* (1984), 271 N.L.R.B. 397, 116 L.R.R.M. 1417, wherein the NLRB majority, in a 3 to 1 decision, held the six-month limitation period of section 10(b) begins to run on the date of the alleged unlawful act, rather than on the date its consequences become effective.

In *United States Postal Service*, the NLRB stated:
"In the past, the [NLRB] has construed the 10(b) period to begin not from the time an employee receives unequivocal notice of an adverse employment action, but instead from the time the action becomes effective. Appellate courts, however, have disagreed with the [NLRB's] interpretation." (271 N.L.R.B. at 398, 116 L.R.R.M. at 1418.)

The NLRB went on to discuss its earlier decisions, and those of the Federal courts, in *Roman Catholic Diocese of Brooklyn* (1976), 222 N.L.R.B. 1052, 91 L.R.R.M. 1419, *enf. denied in relevant part sub nom. Nazareth Regional High School v. NLRB* (2d Cir. 1977), 549 F.2d 873, 94 L.R.R.M. 2897, *California School of Professional Psychology* (1977), 227 N.L.R.B. 1657, 95 L.R.R.M. 1032, *enf. denied* (9th Cir. 1978), 583 F.2d 1099, 99 L.R.R.M. 3195, and *NLRB v. Local 30, International Longstoremen & Warehousemen's Union* (9th Cir. 1977), 549 F.2d 698, 94 L.R.R.M. 3072. The NLRB reconsidered its interpretation and application of section 10(b) based on these decisions and on the decisions of the United States Supreme Court in *Delaware State College v. Ricks* (1980), 449 U.S. 250, 66 L. Ed. 2d 431, 101 S. Ct. 498 (interpreting the 180-day filing period for charge under Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e *et seq.* (1982)) and the limitation period for a suit under a separate statute (42 U.S.C. §1981 (1982))), and *Chardon v. Fernandez* (1981), 454 U.S. 6, 70 L. Ed. 2d 6, 102 S. Ct. 28 (which applied the principles established in *Ricks* to a situation involving employee termination rather than tenure).

The NLRB majority in *United States Postal Service* overruled its earlier decisions in *Roman Catholic Diocese* and *California School* and stated a new policy consistent with the reasoning in *Ricks* and *Chardon*:

"In keeping with the teaching of *Ricks* and *Chardon*, *the [NLRB] will henceforth focus on the date of the alleged unlawful act, rather than on the date its consequences become effective*, in deciding whether the period for filing a charge under Section 10(b) has expired. Where a final adverse employment decision is made and communicated to an employee—whether the decision is nonrenewal of an employment contract, termination, or other alleged discrimination—the employee is in a position to file an unfair labor practice charge and must do so within 6 months of that time rather than wait until the consequences of the act become most painful [citing to *Ricks*, 449 U.S. at 258, 66 L. Ed. 2d at 440, 101 S. Ct. at 504, and *Chardon*, 454 U.S. at 8, 70 L. Ed. 2d at 9, 102 S. Ct. at 29]. We therefore overrule our earlier decisions in *Roman Catholic Diocese* and *California School*, as well as other decisions inconsistent with today's holding." (Emphasis added.) (271 N.L.R.B. at 399-400 & n.13, 116 L.R.R.M. at 1419-20 & n.13.)

The NLRB majority went on to discuss member Zimmerman's dissent, stating:

"Our dissenting colleague argues that the court of appeals opinions in *Nazareth* and *California School* and the Supreme Court decisions in *Chardon* and *Ricks* are distinguishable because they involve 'one fact pattern—employees who were notified that their employment would cease when their contracts or appointments expired.' He contends that in those cases 'notification [of the decision not to renew the employee's contract or appointment] was the only affirmative act from which any alleged discrimination could flow.' Member Zimmerman further argues that, unlike the situation where expiration of a contract or appointment is involved, a discharge in any other context does not trigger the 10(b) period 'until the notice is implemented by action,' and that the 'discharge constitutes an action separate and distinct from the notice.'

*Chardon* involved notice to nontenured school administrators that their appointments would expire on certain dates. The Court in *Chardon* emphasized that 'a final decision had been made to terminate their appointments,' and added, '[T]hat they were afforded reasonable notice cannot extend the period within which suit must be filed.' 454 U.S. at 8. It is thus plain that

Member Zimmerman's attempted distinction between notice of termination and termination was rejected by the Court. Nor have the courts that have applied *Ricks* and *Chardon* drawn a distinction between an employer's telling an employee he will be discharged and informing him that his contract or appointment will not be renewed. \*\*\*

Member Zimmerman is correct that we overrule *Mack Trucks*, 230 NLRB 993 (1977), petition for review denied in unpublished opinion 573 F.2d 1302 (3d Cir. 1978), *cert. denied* 439 U.S. 825 (1978). There, the employer informed a truck salesman, Hill, by letter dated 28 October and received 29 October 1975, that his employment was 'cancelled' in accordance with his employment contract, effective 6 November 1975. The charge was filed 5 May 1976. The judge reasoned that two alleged unfair labor practices were involved, an 8(a)(1) when Hill was notified of his termination, and another when the discharge was implemented. The judge thus concluded that the unlawful discharge allegation was not time-barred. Plainly, under today's decision, the 10(b) period would have commenced on 29 October and thus would have expired before the charge filing." (271 N.L.R.B. at 400-01, 116 L.R.R.M. at 1420.)

On its facts, the NLRB majority thereby held the employee's unfair labor practice charge against the employer as time barred, holding the employee received unequivocal notice the employer was removing him from employment by letter of February 1981—outside the six-month period—rather than on the date the removal was effected.

In so ruling the NLRB rejected a long line of NLRB and Federal court decisions holding that, "when two separate unfair labor practices could be alleged, a charge filed within 6 months of the latter conduct is timely within the intendment of Section 10(b)." *(United States Postal Service,* 271 N.L.R.B. at 403, 116 L.R.R.M. at 1423 (member Zimmerman, dissenting) (and cases cited therein).) As stated by one commentator, *United States Postal Service* changed the law as it historically had been. See Walther, *The NLRB Today,* 36 Lab. L.J. 803, 805 & n.7, app. No. 16, at 813 (1985) (and cases cited therein).

IV

The Association asserts *Jim O'Donnell, Inc.* (1959), 123 N.L.R.B. 1639, 44 L.R.R.M. 1182, has not been overruled and remains persuasive authority on the point that implementation, rather than announcement, of a unilateral policy change tolls the statute of limitations under section 10(b) of the LMRA. Clearly, that decision predated the NLRB's

decision in *United States Postal Service*. Further, we conclude the case is distinguishable from that present here.

In *Jim O'Donnell, Inc.*, the three-member NLRB panel adopted the findings, conclusions, and recommendations of the trial examiner. In that case, the employer was charged with an unfair labor practice because it maintained a pension trust plan which, *by its terms*, denied benefits to employees who were or became members of a labor organization and, on a specified date, terminated the participation of the named employees and refused to allow other named employees to participate in the plan because the employees were or became members of the union. The NLRB trial examiner rejected the respondent employer's defenses, finding, initially, the union did not waive or bargain away union employee participation in the plan during the course of contract negotiations as a *quid pro quo* for other benefits or concessions granted by the employer; rather, resolution of this issue was reserved and deferred for consideration at a later date without any relation to the terms of the contract already agreed upon and executed.

The trial examiner also rejected the employer's section 10(b) argument. As constituted, the employer's plan provided for appointment of a committee by the board of directors of the employer, consisting of employees and participants under the plan, which would certify to the trustee the names of all employees who had qualified to participate in the plan. The trial examiner reasoned the section 10(b) period did not begin to run until employees were notified by the employer of official disqualification from the plan. Otherwise, the employer, by deliberately withholding information concerning the committee's official action from the employee beyond the limitation period of section 10(b), could bar employees from filing charges upon which an unfair practice complaint could issue. The record did not disclose notification to more than two employees after the committee certified the list of qualified participants to the trustee. Finally, the trial examiner stated the employer's violation was a continuing one since it continued to unlawfully discriminate against employees who joined the union and continued maintenance of the nonunion clause in the plan itself constituted a "continuing unlawful restraint on the employee's self-organizational rights." *Jim O'Donnell, Inc.*, 123 N.L.R.B. at 1647 & n.14 (trial examiner's recommended decision).

*Jim O'Donnell, Inc.* thus stands for the principle that it is illegal to maintain contracts containing provisions which, by their very terms, may be regarded as "inherently destructive of employee self-organizational rights" under section 7 of the LMRA, *i.e.*, language which expressly favors or disfavors union membership over nonmembership. It

is also not inconsistent with the theory that announcement of the decision tolls the statute because announcement and implementation coincided for those employees who were not given notice of disqualification. See Modjeska, *Eligibility Clauses in Benefit Plans Under the LMRA—Some Hidden Pitfalls*, 24 Lab. L.J. 67 (1973); see also *Niagara Wire, Inc.* (1979), 240 N.L.R.B. 1326, 1327 & n.4, 100 L.R.R.M. 1451, 1452 & n.4 (IBEW, Local Union No. 1965); *Consolidation Coal Co.* (1982), 260 N.L.R.B. 466, 468 & nn.2 & 3, 109 L.R.R.M. 1202 (discussion within administrative law judge's decision) (and cases cited therein).

The Association's citation of other cases, including, *e.g.*, the administrative law judge's discussion of section 10(b) in *Harvard Folding Box Co.* (1984), 273 N.L.R.B. 841, 845-47 (Boston Local No. 600, Graphic Arts International Union), do not require a contrary result. There, the NLRB panel referred to "the well-established principles that the 10(b) period does not start to run until the charging party has notice of the events underlying the charge and that the proponent of the 10(b) defense has the burden of establishing notice. *Strick Corp.*, NLRB 210 (1979); *AMCAR Division*, 234 NLRB 1063 (1978)." (*Harvard Folding Box Co.*, 273 N.L.R.B. at 841 n.1, 118 L.R.R.M. at 1324 n.1.) The IELRB here found the charging party had such notice.

An apt discussion of the differing principles involved when confronting this question is contained in the Supreme Court's decision in *Local Lodge No. 1424, International Association of Machinists, AFL-CIO v. NLRB* (1960), 362 U.S. 411, 416-17, 4 L. Ed. 2d 832, 837-38, 80 S. Ct. 822, 826-27, wherein the Court reasoned:

"It is doubtless true that §10(b) does not prevent all use of evidence relating to events transpiring more than six months before filing and service of an unfair labor practice charge. However, in applying rules of evidence as to the admissibility of past events, due regard for the purposes of §10(b) requires that two different kinds of situations be distinguished. The first is one where occurrences within the six-month limitations period *in and of themselves may constitute, as a substantive matter, unfair labor practices.* There, earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose §10(b) ordinarily does not bar such evidentiary use of anterior events. The second situation is that where conduct occurring within the limitations period can be charged to be an unfair labor practice *only through reliance on an earlier unfair labor practice.* There the use of the earlier unfair labor practice is not merely 'evidentiary,' since

it does not simply lay bare a putative current unfair labor practice. Rather, it serves to cloak with illegality that which was otherwise lawful. And where a complaint based upon that earlier event is time-barred, to permit the event itself to be so used in effect results in reviving a legally defunct unfair labor practice." (Emphasis added.)

See also Annot., *Consideration of events occurring more than 6 months prior to filing of unfair labor practice charge with NLRB in determining whether occurrence within 6-month period is unfair labor practice as to which Board may (under 29 U.S.C. §160(b)) issue complaint*, 4 L. Ed. 2d 2094 (1960) & Later Case Service, at 228-31, & Supp. 1988, at 38.

■ When viewed in this context, the decisions in *Jim O'Donnell, Inc.*, and *United States Postal Service* may readily be harmonized. While the proper focus is on the time of the discriminatory act and not the point at which the consequences of the act become most painful (*Ricks*, 449 U.S. at 258, 66 L. Ed. 2d at 439-40, 101 S. Ct. at 504; *Chardon*, 454 U.S. at 8, 70 L. Ed. 2d at 9, 102 S. Ct. at 29), one must also consider the nature of the discriminatory act. Thus, the discriminatory act in *Jim O'Donnell, Inc.* was the continued inclusion and application of a nonunion clause in a pension trust fund plan, a *per se* continuing unlawful restraint of employees' self-organizational rights, whereas in *United States Postal Service* the discriminatory act was unequivocal notice to the employee that he was being removed from employment for misconduct, alleged violations of postal service standards of conduct and failure to follow instructions.

■ In this case, the Association alleged the district violated sections 14(a)(1) and (a)(5) by unilaterally changing and implementing a new policy regarding outside teaching credit for placement on the salary schedule. In the context of the charge made, we find the IELRB reasonably concluded the limitation period began when the charging party became aware (or should have become aware) of the change in policy—and this date was that upon which the change was unambiguously announced, rather than the date it was implemented, since the claimed unfair labor practice is the unilateral change in policy not its application to particular individuals *per se*.

■ The Association's further argument it did not have clear and unequivocal notice of implementation of the policy until September 10, when it determined Hale had been hired with less than full credit for prior teaching experience, is unpersuasive. Based on stipulated facts, the Association clearly could be imputed with actual knowledge of the policy change when the Association's president wrote a letter to the

superintendent of schools on July 29, 1985, requesting the district's board reconsider the rescission of the policy; when the Association was notified on August 6, 1985, the board was not going to reverse its position; and when Hale was approved for employment under specific terms on July 31, 1985, and signed the contract the following day which specifically contained a clause regarding credit for past teaching experience. We conclude the IELRB properly determined the unfair labor practice charge was not filed within the requisite six-month period provided by section 15 of the Act.

## V

The Association also contends the case must be remanded to the IELRB because the IELRB did not expressly address the "independent statutory violation" alleged in the charge, the district's October 21, 1985, denial of the Association's request to bargain its July 17, 1985, decision to rescind the policy concerning credit for past teaching experience. We disagree.

It is not any refusal to bargain which will sustain a finding of an independent unfair labor practice based on section 14(a)(5) of the Act. The demand to bargain does not exist in a vacuum. Where a complaint based upon an earlier unlawful event is time barred, a refusal to bargain over the same matter will neither revive a legally defunct unfair labor practice nor constitute an independent unfair labor practice for the purpose of triggering a new six-month limitation period. An employer's unilateral alteration of prevailing terms and conditions of employment may constitute an unlawful refusal to bargain (*NLRB v. Katz* (1962), 369 U.S. 736, 743-47, 8 L. Ed. 2d 230, 236-38, 82 S. Ct. 1107, 1111-13), but subsequent overt refusal to bargain over the same subject matter relates directly to the antecedent events giving rise to the unfair labor practice charge. To conclude otherwise would render the statutory limitation period meaningless by permitting the Association an unlimited amount of time to delay challenging the employer's actions without regard to whether the discriminatory act giving rise to the charge occurred within six months of bringing the charge. In these circumstances, the direct refusal to bargain is not a new act of discrimination.

Accordingly, we hold the IELRB did not err in dismissing the charge on the basis the unfair labor practices alleged were not timely filed under section 15 of the Act.

Affirmed.

KNECHT and GREEN, JJ., concur.