BOARD OF EDUCATION OF SESSER-VALIER COMMUNITY UNIT SCHOOL DISTRICT No. 196, Petitioner, v. ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD *et al.,* Respondents.

Fourth District No. 4—92—0151

Argued August 19, 1992.—Opinion filed September 2, 1993.

John T. Taylor (argued), of Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., of Decatur, and Merry C. Rhoades, of Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., of Carbondale, for petitioner.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Jerald S. Post, Assistant Attorney General (argued), of Chicago, of counsel), for respondent Illinois Educational Labor Relations Board.

Wanda Van Pelt (argued), of Illinois Education Association-NEA, of Edwardsville, for other respondent.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

The Board of Education (Board) of Sesser-Valier Community Unit School District No. 196 (District) appeals from findings and orders of the Illinois Educational Labor Relations Board (IELRB). (*Sesser-Valier Community Unit School District 196*, 8 Pub. Employee Rep. (Ill.) par. 1023, No. 91—CA—0017—S (Illinois Educational Labor Relations Board January 28, 1992) (hereafter 8 Pub. Employee Rep. (Ill.) par. 1023).) The findings and orders followed complaints by the Sesser-Valier Education Association, IEA-NEA (Association).

In a nutshell, this case involves the District giving benefits to certain employees without bargaining with the Association. This action by the District indicates a misunderstanding of the District's responsibilities under section 14 of the Illinois Educational Labor Relations Act (Act) (Ill. Rev. Stat. 1991, ch. 48, par. 1714). In this opinion, we hope to make clear to school administrators and school boards that the Act changed the rules dealing with employees. One of these changes is that employee benefits may no longer be changed and special benefits can no longer be given without the opportunity for good-faith bargaining.

I. BACKGROUND

In the fall of 1989, Wayne Samuels, a long-time employee and Association member, sought to take early retirement and to have the District pick up the cost of his adding three years' military leave of absence credit (an estimated cost of $9,003). The superintendent of schools notified the Association president, who subsequently acknowledged the costs to be picked up by the District as

recognized practice, but stated the military cost was a deviation and "a proper subject for the collective[-]bargaining process." The District, without collective bargaining, agreed to pick up the estimated cost of $9,003.

In the spring of 1990, David Simpson, an Association member received (without prior bargaining with the Association) the approval of the District superintendant for a three-year leave of absence, with the District picking up Simpson's health insurance and retirement contributions. The Association became aware of this arrangement after the fact.

In February 1988, Stan Douglas, a half-time teacher (guidance counselor), contacted the District about early retirement (with a three-year part-time contract of 75/180 days' salary for certified work as a guidance counselor, plus $100-per-day clerical work at the beginning and end of the school year). Douglas' suggestion was approved without Association approval or bargaining; the Association learned of the arrangement regarding Douglas at the April 1988 Board meeting when the Board approved it.

In October 1988, the Association wrote the Board president that the District's arrangement with Douglas violated the parties' bargaining agreement and the District had no authority to bargain with an individual about a certified position; the letter stated the Association planned " 'no action *** at this time, but we demand that the [B]oard refrain from any further bargaining which violates our agreement and subverts the [A]ssociation.' " 8 Pub. Employee Rep. (Ill.) par. 1023, at IX—96.

In July 1990, the Board approved a motion to rehire Douglas under the arrangement it had approved in 1988.

After a few years' service as volunteer pompon sponsor, the Board awarded Colleen Cochran, who was not otherwise employed by the District and was not a member of the bargaining unit, a $500-per-year contract upon her request, without notice to the Association that this would be a *paid* position and without bargaining as to its terms.

In a decision dated January 28, 1992, the IELRB agreed that the District violated section 14(a)(5) and, derivatively, section 14(a)(1) of the Act (Ill. Rev. Stat. 1991, ch. 48, pars. 1714(a)(5), (a)(1)). The IELRB concluded as follows:

> "The District violated Section 14(a)(5) and, derivatively, Section 14(a)(1) of the Act by bypassing the Association and entering into individual arrangements with Samuels and Simpson. The District also violated Section 14(a)(5) and, de-

rivatively, Section 14(a)(1) of the Act by unilaterally changing the wages, hours[,] or terms and conditions of employment of Samuels, Simpson and Douglas. In addition, the District violated Section 14(a)(5) and, derivatively, Section 14(a)(1) of the Act by unilaterally subcontracting the pompon squad sponsor position and by unilaterally establishing the compensation for that position." 8 Pub. Employee Rep. (Ill.) par. 1023, at IX—96 through IX—97.

The IELRB did not order that the District rescind the actions it had taken toward Samuels, Simpson, and Douglas. Instead, the IELRB ordered the District to cease and desist from (1) bypassing the Association; (2) refusing to bargain collectively by unilaterally changing wages, hours, or terms and conditions of employment; and (3) interfering with, restraining, or coercing employees in the exercise of rights guaranteed under the Act. It also ordered the District to take certain affirmative steps, including the rescission of the subcontracting of the pompon squad sponsor.

## II. ANALYSIS

■ Section 10(a) of the Act requires educational employees to bargain in good faith with the exclusive representative of the employees over wages, hours, and other terms and conditions of employment. (Ill. Rev. Stat. 1991, ch. 48, par. 1710(a).) Terms and conditions of employment that intimately and directly affect the work and welfare of employees include wages, health insurance, pension contributions, life insurance, medical insurance, and hours. (*Vienna School District No. 55 v. Illinois Educational Labor Relations Board* (1987), 162 Ill. App. 3d 503, 507, 515 N.E.2d 476, 479.) Unilateral changes by employers in these terms and conditions constitute an unfair labor practice because they deprive employees of the right to bargain. *East Richland Education Association v. Illinois Educational Labor Relations Board* (1988), 173 Ill. App. 3d 878, 528 N.E.2d 751.

Regardless of the District's argument, its actions here were not consistent with past practices. These actions provided special benefits to certain employees. In this context, the past-practice exception should be narrowly construed so that it is not used to circumvent the bargaining requirement. Past practices suggested by the District were not equivalent to the economic benefits granted to these three men, Samuels, Simpson, and Douglas. In other words, as the IELRB noted, before approving the proposals of Samuels and Simpson, the District had never granted an employee credit for

three years of service toward early retirement. 8 Pub. Employee Rep. (Ill.) par. 1023, at IX—95.

■ If we have failed in the past, we now make clear that an educational employer violates the essential principle of collective bargaining when that employer bargains, or attempts to bargain, with an individual employee or employees with respect to wages, hours, and terms or conditions of employment. (See *Medo Photo Supply Corp. v. N L R B* (1944), 321 U.S. 678, 684, 88 L. Ed. 1007, 1011, 64 S. Ct. 830, 833.) We further hold that payment of retirement contributions is included within terms or conditions of employment.

The rationale for holding so called *"direct dealing"* an unfair labor practice was well stated by the National Labor Relations Board in *Medo.*

" 'To permit the employer to go behind the chosen bargaining agent and negotiate with the employees individually, or with their committees, in spite of the fact that they had not revoked the agent's authority, would result in nothing but disarrangement of the mechanism for negotiation created by the Act, disparagement of the services of the union, whether good or bad, and acute, if not endless, friction, which it is the avowed purposed of the Act to avoid—or mitigate.' In these circumstances, *for the respondent to deal directly with its employees was to deny to the Union its statutory status* and was, therefore, a refusal to bargain collectively.

The validity of this conclusion is not altered, as the respondent contends, by the mere fact that the direct dealing emanated from the employees rather than from the respondent. The gist of the respondent's violation of the Act is its direct negotiations with the employees after they had designated, and the respondent had recognized, an *exclusive* bargaining representative. It is, therefore, immaterial from whence came the impulse to deal directly." (Emphasis added.) (*In re Medo Photo Supply Corp.* (1942), 43 N.L.R.B. 989, 997-98, quoting *N L R B v. Acme Air Appliance Co.* (2d Cir. 1941), 117 F.2d 417, 420.)

The District contends that it conducted no "negotiations" because it accepted the proposals of Samuels and Simpson without alteration. The District argues that no authority holds that an employer cannot listen to employees without the exclusive representative being present. It further maintains there was no finding by the IELRB, nor were any facts presented by the Association, that the

District used this method to secure an advantage in its bargaining relationship.

We conclude that the District here did more than merely listen to the individual employees; it also acted on their requests to affect the terms and conditions of their employment—without notice to and bargaining with the Association—to the economic advantage of the individual employees. The IELRB's analysis of the employer's argument on this point makes clear that the violation lies in *bypassing the exclusive representative* in dealing directly with individual employees on such matters. (8 Pub. Employee Rep. (Ill.) par. 1023, at IX—93 through IX—95.) This bypassing necessarily undermines the Association's status as the exclusive bargaining representative of employees in the bargaining unit when individual employees can, by going directly to the superintendent with a proposal, secure for themselves benefits that the Association did not procure for them. The power to deal with individual members of the Association would give the employer the power to effectively undermine the Association, contrary to the intent of the Act.

Once the Association notified the employer that the military retirement credit contribution was a bargaining issue, waiver of the requirement did not take place by the Association's representative's attendance at the Board meeting. We will not require representatives to follow up bargaining demands with conflict at Board meetings. We agree with the IELRB that midterm bargaining was obligatory and that the arrangements made here were not consistent with past practices.

■ The District also argues that the unfair labor practice charge alleging a unilateral change in the arrangement with Douglas was untimely filed. (Ill. Rev. Stat. 1991, ch. 48, par. 1715.) An unfair labor practice charge must be filed within six months of the time the charging party was put on notice, actual or constructive, of the unlawful conduct. (*Wapella Education Association v. Illinois Educational Labor Relations Board* (1988), 177 Ill. App. 3d 153, 160, 531 N.E.2d 1371, 1375.) Usually, that time will be the date the change is unambiguously announced, not the date the change is implemented. (*Wapella*, 177 Ill. App. 3d at 160, 531 N.E.2d at 1375.) The District argues it retained Douglas' services on a part-time basis for three years (1988-89, 1989-90, and 1990-91) in its 1988 agreement with him, and that there was no "negotiation" for entering into a separate agreement between the Board's original action on April 11, 1988, and its action on July 23, 1990. The District therefore argues that any violation of the Act occurred on April 11,

1988; thus, the Association's October 3, 1990, charge was untimely. Although Douglas' 1988 proposal was that he be hired for a three-year period, the record does not show that the District's action in April 1988 was to be final and effective for all three school years; if it had been intended to extend through the 1990-91 school year, there was, as the IELRB found, no reason for the Board to again approve the arrangement with Douglas in July 1990. The IELRB found the District's July 1990 approval of the arrangement to be a separate action and an independent basis for an unfair labor practice, though it did find the Association's direct dealing charge was untimely as to Douglas. (8 Pub. Employee Rep. (Ill.) par. 1023, at IX—93.) We cannot say the IELRB erred in its determination.

■ The IELRB concluded the District violated sections 14(a)(5) and 14(a)(1) of the Act by unilaterally hiring a nonmember of the bargaining unit to fill the pompon squad sponsor position and unilaterally establishing the wages, hours, or terms and conditions of employment of that position. Unilaterally subcontracting work is an unfair labor practice when:

> " '[T]he contracting out involved a departure from previously established operating practices, effected a change in conditions of employment, or resulted in a significant impairment of job tenure, employment security, or *reasonably anticipated work opportunities* for those in the bargaining unit.' " (Emphasis added.) *State Community College*, 6 Pub. Employee Rep. (Ill.) par. 1067, at IX—197, No. 90—CA—0004—S (Illinois Educational Labor Relations Board, hearing officer's recommended decision and order, April 16, 1990), quoting *Westinghouse Electric Corp.* (1965), 150 N.L.R.B. 1574, 1576, 58 L.R.R.M. 1257, 1258.

Therefore, whether subcontracting is a mandatory subject of bargaining depends upon whether bargaining unit employees had a reasonable expectation of performing the subcontracted work. *Fenton Community High School District 100*, 5 Pub. Employee Rep. (Ill.) par. 1004, No. 87—CA—0009—C (Illinois Educational Labor Relations Board November 29, 1988); see also *Waverly Community Unit School District No. 6*, 5 Pub. Employee Rep. (Ill.) par. 1002, No. 86—CA—0014—S (Illinois Educational Labor Relations Board November 29, 1988) (bargaining-unit members must have reasonably anticipated that a position was a work opportunity).

The District argues it had no duty to bargain over the pompon sponsor position because that position was not a "reasonably anticipated work opportunity." The District notes that (1) no member of

the bargaining unit had ever held the position of pompon sponsor; (2) nonmembers of the bargaining unit filled some other extracurricular positions, including junior high basketball coach and assistant football coach; and (3) the collective-bargaining agreement did not list the position of pompon squad sponsor. The District contends that because the collective-bargaining agreement does not establish the pompon sponsor position to be an employment opportunity for members of the bargaining unit, the IELRB erred in holding the District had an obligation to bargain over terms and conditions of the pompon sponsor position.

The IELRB contends the collective-bargaining agreement contained a list of all paid extracurricular positions and a provision allowing the District to negotiate a salary with nonmembers of the bargaining unit "[w]hen the Board is unable to fill the above positions with teachers seventy-five (75) days prior to the beginning of school." The IELRB concedes that the position of pompon squad sponsor had not been listed in the collective-bargaining agreement; however, it notes the position had never before been a paid position. The IELRB notes that the collective-bargaining agreement listed no other extracurricular paid positions. Buchanan testified that in the past unpaid extracurricular positions were added to the list as they became paid positions. The IELRB noted that when the positions of marching band director and scholar bowl sponsors became paid positions in 1988, they were added to the list and compensation collectively bargained for each. Moreover, the IELRB contends that the duties of pompon squad sponsor were not so unique as to require different treatment from that of the listed positions, given that the list already contained two cheerleading coach positions involving duties very similar to those of pompon squad sponsor.

In our opinion, the IELRB was correct in finding that once the pompon squad sponsor position became a paid position, it became a fairly claimable work opportunity for the District's certified employees. In its opinion, the IELRB noted:

> "At the District, paid extra-duty positions, with the exception of the pompon squad sponsor position, are listed in the collec-tive[-]bargaining agreement, and certified employees are guaranteed priority in filling them. The District and the Association have previously negotiated about including extra-duty positions in the parties' agreements and about compensation for the positions. This pattern of negotiation shows that the District's certified employees could reasonably ex-

pect that a similar process would occur for the pompon squad sponsor position once it became a paid position." 8 Pub. Employee Rep. (Ill.) par. 1023, at IX—96.

III. CONCLUSION

For the reasons stated, we affirm the decision of the IELRB.

Affirmed.

KNECHT and LUND, JJ., concur.