#25935-a-SLZ

**2011 S.D. 76**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

AFSCME LOCAL 1025,                                    Petitioner and Appellee,

    v.

SIOUX FALLS SCHOOL DISTRICT,                          Respondent and Appellant,

SIOUX FALLS EDUCATION
ASSISTANTS ASSOCIATION,                               Petitioner and Appellee,

    v.

SIOUX FALLS SCHOOL DISTRICT #49-5
and BOARD OF EDUCATION,                               Respondent and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE  SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JOHN L. BROWN
Judge

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE  SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE WILLIAM J. SRSTKA, JR.
Judge

* * * *

ARGUED OCTOBER 5, 2011

OPINION FILED **11/16/11**

SHANE E. EDEN of
Davenport, Evans, Hurwitz & Smith, LLP
Sioux Falls, South Dakota

and

SUSAN BRUNICK SIMONS of
Sioux Falls School District
Sioux Falls, South Dakota

Attorneys for respondents and
appellants Sioux Falls School
District #49-5 and Board of
Education.

LINDA LEA M. VIKEN of
Viken Law Firm
Rapid City, South Dakota

Attorney for petitioner and
appellee AFSCME Local 1025.

ANNE E. PLOOSTER of
South Dakota Education Association
Pierre, South Dakota

Attorney for petitioner and
appellee Sioux Falls Education
Assistants Association.

#25935

ZINTER, Justice

[¶1.]        AFSCME Local 1025 (Local 1025) and the Sioux Falls Education
Assistants Association (SFEAA) filed grievances against the Sioux Falls School
District (District).  The unions alleged that the District violated the parties' labor
agreements when the District provided 2.5% wage increases for the 2008-2009
school year.  The issues on appeal are: whether the grievances were filed too late;
and if not, what the proper wage increases were following a change in a school
funding statute that was used in the agreements to determine wage increases.

*Facts and Procedural History*

[¶2.]        Local 1025 and SFEAA are unions representing certain non-
instructional employees of the District.  The unions negotiated labor agreements
with the District covering wages and other terms of employment for a six-year term
(July 1, 2007 through June 30, 2013).  Both agreements provided for a 10% salary
increase the first year.  Increases for years two through six were to correlate with
the percentage change in what the agreements referred to as the "State Rate."  The
State Rate is defined in the agreements as "the 'Per Student Allocation' as defined
in [SDCL] 13-13-10.1(4)."  The per student allocation in SDCL 13-13-10.1(4) is set
by the Legislature each year.  It is the money the Legislature appropriates (on a
per-pupil basis) to school districts for education funding.  *See Davis v. State*, 2011
S.D. 51, ¶¶ 19, 20, 30, 804 N.W.2d 618, 629, 632.  The parties agree that the
appropriate wage increase for the 2008-2009 school year should be the percentage
change in the per student allocation (the State Rate) approved by the 2008
Legislature.  This dispute arose because, unlike prior years, the 2008 Legislature

-1-

increased the per student allocation by two alternative percentages and the parties cannot agree which percentage applies.

[¶3.]    The 2008 legislation originated as Senate Bill 187.[1]  Section 1 of Senate Bill 187 amended SDCL 13-13-10.1(4) by increasing the 2008-2009 per student allocation by 3%.  Section 2, however, (later codified as SDCL 13-13-10.6) provided only a 2.5% increase in the 2008-2009 per student allocation if a school district did not certify to the Secretary of Education that the district would increase its average teacher salary and benefits by at least 3% and that it would spend an additional $22.64 of the new per student allocation on teacher salaries and benefits.  There is no dispute that the District's pre-existing contract with its teachers already

---

1.    Senate Bill 187, in its legislative format, provided:

> FOR AN ACT ENTITLED, An Act to revise the state aid to education formula for the purpose of increasing teachers['] salaries, . . .
>
> Section 1.  That subdivision (4) of § 13–13–10.1 be amended to read as follows: . . . (4) "Per student allocation," for school fiscal year 2008 2009 is $4,528.80 $4,664.66.  Each school fiscal year thereafter, the per student allocation is the previous fiscal year's per student allocation increased by the index factor;
>
> Section 2.  For school fiscal year 2009, for any school district that does not certify to the secretary of education that its average teacher salary and benefits will increase by at least three percent, and that it will spend at least $22.64 per fall enrollment as defined in subdivision 13-13-10.1(2A) on teacher salaries and benefits in excess of the school district's FY 2008 expenditures on teacher salaries and benefits, increased by the index factor as defined in subdivision 13-13-10.1(3), the per student allocation pursuant to subdivision 13-13-10.1(4) is $4,642.02.

2008 S.D. Sess. Laws ch. 77.

#25935

required the District to provide more than a 3% increase in the average teacher salary and benefits for the 2008-2009 school year.

[¶4.] On April 8, 2008, the District called a meeting for all unions affected by Senate Bill 187. Although it appeared that the District's contract with its teachers would satisfy Senate Bill 187's requirement for the 3% increase in per student allocation (the State Rate), the District Superintendent indicated that the District only intended to increase Local 1025 and SFEAA members' wages by 2.5%. The District did, however, offer a 3% increase to the members of Local 1025 and SFEAA if they would approve a memorandum of understanding (MOU) agreeing that a 3% increase was not required by the parties' labor agreements. The MOU also required the union members to agree that future State restrictions on local district spending (like that found in Section 2 of Senate Bill 187) would not be considered part of future State Rate increases as that term was used in the labor agreements.[2]

---

2. The MOU provided:

> NOW, THEREFORE, the parties hereto agree as follows:
>
> Section 1. The District agrees to calculate the FY09 Uniform Salary Schedule increases based on a State Rate of 3.0 percent rather than 2.5 percent.
>
> Section 2. The [Union] agrees that, from FY10 through FY13, State Rate increases that come with stipulations that adversely affect the amount of discretionary dollars available to the District (e.g. a state requirement directing State Aid dollars in excess of the District/[Union] Negotiated Agreement be spent on increasing teachers' salaries) will not be considered part of the State Rate increase.

-3-

[¶5.] On April 14, Local 1025 called the District Superintendent and advised that its members had voted to reject the MOU. Local 1025 also sent an email on April 18 stating its belief that its members were entitled to a 3% raise under the existing agreement. Similarly, SFEAA sent the Superintendent an email on April 17 stating that it had been advised by counsel that its members were entitled to a 3% raise without signing the MOU. On April 23, SFEAA advised the Superintendent that SFEAA's members had voted to reject the MOU.

[¶6.] On May 12, the District certified to the Secretary of Education that it would increase its average teacher salary and benefits by at least 3% and spend the additional $22.64 on those salaries and benefits. This certification complied with the requirements of Section 2 of Senate Bill 187 (SDCL 13-13-10.6) and entitled the District to receive the 3% increase in per student allocation referenced in Section 1 of Senate Bill 187 (SDCL 13-13-10.1(4)). Nevertheless, the District's Board of Education subsequently adopted a budget on June 23 that only granted a 2.5% wage increase for the members of Local 1025 and SFEAA.

[¶7.] The parties' agreements contained grievance procedures that were substantively the same. Class grievances were defined as complaints by more than one employee "concerning the interpretation of or application of the existing provisions" of the agreements. Both agreements required that grievances be filed within thirty days of the alleged "violation," or within thirty days of when through reasonable diligence the violation should have been discovered.

[¶8.] On June 18, the District received a written grievance from Local 1025. The grievance identified the "violation" as the: "Denial of wage increase . . ." as

required by the agreement. Local 1025 requested "to be made whole [with a] 3% increase instead of 2.5% . . . ." On July 10, the District received a written grievance from SFEAA stating its "problem" was: "The District has misinterpreted . . . [the] Agreement. The state funding formula for the 2008-2009 school year for all Sioux Falls School District Employees [was] 3% not 2.5%." The SFEAA grievance indicated the incident date was June 23, 2008, the day the District implemented the wage increase. SFEAA requested "that [its members] be paid 3% plus interest . . . to be made whole when this grievance process is complete."

[¶9.] The District denied both grievances as untimely. Local 1025 and SFEAA subsequently petitioned the Department of Labor to review the matter. The Department dismissed both grievances as untimely. The unions then appealed the Department's decision to circuit court. The sixth judicial circuit court, Judge Brown presiding, concluded that the grievances were timely. Judge Brown reversed and remanded the matter to the Department to determine the correct percentage wage increase.

[¶10.] On remand, all parties moved for summary judgment. The Department concluded that the members of Local 1025 and SFEAA were entitled to a 3% wage increase for the 2008-2009 school year. The District then appealed that decision to circuit court. Following a change of venue, the second judicial circuit court, Judge Srstka presiding, affirmed the Department. The District now appeals to this Court, contending that the grievances were untimely and that the members of Local 1025 and SFEAA were only entitled to a 2.5% wage increase.

*Decision*

[¶11.]     A resolution of these issues requires interpretation of the parties' agreements and the statute referenced in those agreements.  Contract and statutory interpretation are questions of law we review de novo.  *Leonard v. State ex rel. S.D. Real Estate Comm'n*, 2010 S.D. 97, ¶ 8 n.1, 793 N.W.2d 19, 22 n.1.

[¶12.]     The Department lacks jurisdiction over a grievance that is not timely filed in conformity with grievance procedures.  *Cox v. Sioux Falls Sch. Dist. 49-5*, 514 N.W.2d 868, 871 (S.D. 1994).  The District argues that Local 1025's and SFEAA's grievances were not filed within thirty days of the time the unions should have, through reasonable diligence, discovered the District's purported violation of the agreements.  The District points out that the agreements defined a grievance as a complaint concerning an "interpretation" or application of the agreements.  The District argues that Local 1025 and SFEAA were fully aware of the District's interpretation by April 18 and April 23: those were the dates the respective unions notified the District that they disagreed with the District's interpretation of Senate Bill 187's effect on the agreements.  Therefore, the District contends that the June 18 and July 10 grievances were filed beyond the thirty-day time limit.

[¶13.]     Local 1025 and SFEAA argue that the latest time to file a grievance was not triggered until the Board voted on June 23 to implement the 2.5% wage increase.  Local 1025 and SFEAA contend that notwithstanding the Superintendent's interpretation of Senate Bill 187, a misapplication of the agreements did not occur until the District implemented the 2.5% wage increase on June 23.  We agree with the unions.

[¶14.]      We are mindful of the District's argument that the purpose of the grievance procedure is to resolve grievances at the earliest possible time; e.g., with the District before the Department of Labor. We also acknowledge that it may have been possible to file a grievance with the District regarding the Superintendent's April interpretation of Senate Bill 187's effect on the agreements. But in determining when the last grievable "violation" occurred, the District incorrectly focuses on the word "interpretation" to the exclusion of the word "application" in the definition of grievance. Under the parties' agreements, a grievance could be filed "concerning the interpretation of *or application* of the existing provisions of this agreement." (Emphasis added.) "In its ordinary sense, the term 'or' is a conjunction indicating an alternative between different things or actions." *Zoss v. Schaefers*, 1999 S.D. 105, ¶ 6 n.2, 598 N.W.2d 550, 552 n.2. Therefore, Local 1025 and SFEAA were entitled to grieve alternatives: violations involving interpretations or applications of the agreements.

[¶15.]      The official grievance filed by Local 1025 alleged that the violation was the "[d]enial of wage increase." *See supra* ¶ 8. The denial of a proper wage increase occurred on June 23 when the Board[3] applied Senate Bill 187 to the labor

---

3.     The *Superintendent's* earlier communications indicating that the Board would only adopt a 2.5% wage increase was not a *District* violation implementing purportedly improper employee salaries. The District's written policy required the Superintendent "to bring important items requiring Board action to the Board as well as other items that are properly within its legislative function, or those that are required by law." SDCL 13-10-2 only granted "[t]he school board . . . the power to employ personnel deemed necessary by the board and to define the duties and fix the compensation of each." Further, the District's written policy provided that "the Board retain[ed] final authority within the District." And in a June 11 letter, the

(continued . . .)

agreement and implemented the 2.5% wage increase.  The grievance filed by SFEAA also cites the grievance's incident date as June 23 – the day the Board implemented the 2.5% wage increase.  We conclude that even if Local 1025 and SFEAA missed the deadline for grieving the Superintendent's "interpretation" of the agreements, the unions did not miss the deadline to grieve the District's "application" of the agreements.  Because the District did not purportedly misapply the agreements until the Board implemented the 2.5% wage increase at its June 23 meeting, Local 1025's[4] and SFEAA's grievances were timely.[5]

_____

(. . . continued)

District acknowledged that the Board would be approving salary increases at its June 23 meeting.  Therefore, the Superintendent did not have the authority to implement employee compensation for the 2008-2009 school year.  Board action was required.

4.      We acknowledge that Local 1025's June 18 grievance was filed before the June 23 implementation of the 2.5% wage increase.  However, Local 1025 points out that it filed this grievance out of an abundance of caution following a Superintendent and *Board* letter of June 11, indicating that the wage increase "will be 2.5%."

5.      The District also argues that the grievance filing procedure was similar to the time for filing an unfair labor practice complaint under SDCL 3-18-3.4.  That statute requires a complaint to be filed within sixty days of the alleged commission or constructive knowledge of the alleged commission of an unfair labor practice.  The District points out that in *Bon Homme Cnty. Comm'n v. AFSCME Local 1743A*, 2005 S.D. 76, ¶ 43, 699 N.W.2d 441, 460, we stated it was not the county's implementation of a clause that constituted the commission of an unfair labor practice, it was the county's failure to provide a meaningful statement of rationale for its position in negotiations.  We concluded that the county's failure to provide a rationale in negotiations – rather than the county's implementation of the agreement – constituted the commission of an unfair labor practice.  Based on this distinction, the District contends that its alleged "misinterpretation" of the agreements occurring during the negotiations in April was the starting time for filing any grievance regarding this dispute.  We conclude that *Bon Homme* is inapposite.  Acts constituting unfair labor practices in negotiating agreements are often

(continued . . .)

[¶16.]        With respect to the merits, the parties agree that the labor agreements required an annual percentage increase in salary that correlated with the percentage increase in the State Rate. The agreements, however, also provided that the parties would meet to determine the effect on salaries if changes were made in the State funding formula:

---

(. . . continued)

different than wrongful "applications" of completed labor agreements. *Bon Homme* does not apply to a grievance concerning the wrongful application of a completed agreement. Furthermore, in *Bon Homme,* the commission of the unfair labor practice was ongoing through the time the union filed its complaint.

The District's reliance on *Wapella Educ. Ass'n, IEA-NEA v. Ill. Educ. Lab. Relations Bd.*, 531 N.E.2d 1371 (Ill. App. Ct. 1988) is also misplaced. In *Wapella*, the court concluded that the board's official act rescinding a policy and unambiguously announcing a change triggered the time for filing an unfair labor practice. *Id.* at 1380. Because that court concluded that the *board's official act* triggered the violation, *Wapella* supports Local 1025's and SFEAA's contention that the Sioux Falls School District Board's official act of implementing a 2.5% wage increase triggered the time for filing.

The District finally relies on the inquiry notice rule of *Zephier v. Catholic Diocese of Sioux Falls*, 2008 S.D. 56, ¶ 14, 752 N.W.2d 658, 665 ("Statutes of limitations begin to run when plaintiffs first become aware of facts prompting a reasonably prudent person to seek information about the problem and its cause."). But this rule applies to SDCL 26-10-25, which governs the accrual of a cause of action for personal injury caused by child sex abuse. Under that statute, a cause of action accrues when the injured party "is put on inquiry notice of facts that would prompt a reasonably prudent person to seek out information regarding his or her injury or condition and its cause." *Zephier,* 2008 S.D. 56, ¶ 14, 752 N.W.2d at 665. Today's case does not involve discovery of the cause of a person's injuries. Furthermore, even if Local 1025 and SFEAA were subject to notice inquiry, which is essentially constructive notice, the time to file a grievance under the agreements ran from constructive notice of the "violation." And as previously discussed, the labor agreements allowed the unions to file grievances thirty days from violations that involved incorrect applications of the agreements. The alleged incorrect application of the agreements did not occur until the District implemented the 2.5% wage increase on June 23.

> State Rate is the "Per Student Allocation" as defined in section 13-13-10.1(4). If during the six-year term in the contract there is a change in the State funding formula for education, the District and the Union will meet to determine the effect on the salary portion of the agreement.

[¶17.] The District points out that this language required the parties to meet and modify the percentage salary increases to correspond with new changes in the funding formula (other than the anticipated increases in the per student allocation). The District contends that the provision in Senate Bill 187 requiring it spend an additional 3% on teacher salary and benefits as a condition of receiving a 3% increase in per student allocation was such a change in the State's funding formula. The District further contends that the new 2008-2009 per student allocation was the 2.5% increase under Section 2 of Senate Bill 187 (SDCL 13-13-10.6) for non-certifying schools rather than the 3% increase referenced in Section 1 (SDCL 13-13-10.1(4)) for schools that certified they would increase their average teacher salary by 3%.

[¶18.] We assume without deciding that Senate Bill 187's teacher salary requirement constituted a change in the State's funding formula.[6] We further acknowledge that the decision to increase teachers' salaries by 3% was discretionary in each South Dakota school district. Nevertheless, on May 12, 2008, the Sioux Falls District certified that it would provide a 3% increase in average teacher salary and benefits as required by Section 2 of Senate Bill 187 (SDCL 13-13-10.6). That

---

6. We may do so because the District's position is not that the unions failed to meet and determine the effect of the change on the salary portion of the agreement. The District's argument is limited to a matter of statutory and contract construction. The District only argues that following the passage of Senate Bill 187, the State Rate was 2.5% rather than 3%.

certification left no contingency remaining, and the District's per student allocation increased by 3% under Section 1 of Senate Bill 187 (SDCL 13-13-10.1(4)).[7] And because the District's per student allocation referenced in SDCL 13-13-10.1(4) increased by 3%, the State Rate in both labor agreements increased by 3%. Therefore, when the District subsequently met on June 23 to implement wage increases, the members of Local 1025 and SFEAA were contractually entitled to a 3% salary increase. We affirm the Department and circuit court's conclusion that the District violated the terms of the agreements by implementing a percentage wage increase other than the percentage change in the per student allocation referenced in SDCL 13-13-10.1(4) (2008).

[¶19.] GILBERTSON, Chief Justice, and KONENKAMP, SEVERSON and WILBUR, Justices, concur.

---

7. Because the agreements and statutes are clear and unambiguous on this point, we decline the District's invitation to utilize various canons of construction to interpret them differently. *See State ex rel. Dep't of Transp. v. Clark*, 2011 S.D. 20, ¶ 5, 798 N.W.2d 160, 162 ("When the language in a statute is clear, certain, and unambiguous, there is no reason for construction, and [this] Court's only function is to declare the meaning of the statute as clearly expressed.").