#26290, #26293-a-SLZ

**2013 S.D. 10**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA
* * * *

IN THE MATTER OF THE
PREVENTION OF SIGNIFICANT
DETERIORATION (PSD) AIR
QUALITY PERMIT APPLICATION OF
HYPERION ENERGY CENTER –
HYPERION REFINING, LLC –
PERMIT #28.0701 – PSD.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA
* * * *

THE HONORABLE MARK BARNETT
Judge

* * * *
(#26290)

MARTY JACKLEY
Attorney General

ROXANNE GIEDD
Deputy Attorney General
Pierre, South Dakota

Attorneys for appellee South
Dakota Department of
Environment & Natural Resources.

MARTY JACKLEY
Attorney General

CHARLES D. MCGUIGAN
Chief Deputy Attorney General
Pierre, South Dakota

Attorneys for appellee South
Dakota Board of Minerals and
Environment.

* * * *

ARGUED ON OCTOBER 3, 2012
OPINION FILED **01/23/13**

FREDERICK W. ADDISON, III
AMY L. RICKERS of
Munsch, Hardt, Kopf & Harr, PC
Dallas, Texas
    and
TODD MEIERHENRY of
Meierhenry Sargent, LLP
Sioux Falls, South Dakota             Attorneys for appellee Hyperion
                                         Refining, LLC.


ROBERT L. GRAHAM
GABRIELLE SIGEL of
Jenner & Block, LLP
Chicago, Illinois

JOHN H. DAVIDSON, JR.
Vermillion, South Dakota
    and
SAM E. KHOROOSI
Sioux Falls, South Dakota             Attorneys for intervenors and
                                         appellants Sierra Club, Save Union
                                         County, and Citizens Opposed to
                                         Oil Pollution.

(#26293)

MARTY JACKLEY
Attorney General

ROXANNE GIEDD
Deputy Attorney General
Pierre, South Dakota             Attorneys for appellee South
                                         Dakota Department of
                                         Environment & Natural Resources.

MARTY JACKLEY
Attorney General

CHARLES D. MCGUIGAN
Chief Deputy Attorney General
Pierre, South Dakota             Attorneys for appellee South
                                         Dakota Board of Minerals and
                                         Environment.


FREDERICK W. ADDISON, III
AMY L. RICKERS of
Munsch, Hardt, Kopf & Harr, PC
Dallas, Texas
    and
TODD MEIERHENRY of
Meierhenry Sargent, LLP
Sioux Falls, South Dakota             Attorneys for appellant Hyperion
                                         Refining, LLC.

#26290, #26293

ZINTER, Justice

[¶1.]      The Board of Minerals and Environment (Board) authorized the Department of Environment and Natural Resources (DENR) to issue an air quality permit to Hyperion Refining, LLC (Hyperion).  The permit was necessary for Hyperion to begin construction of a proposed petroleum refinery and power plant.  Three citizens groups appealed to circuit court.  Hyperion also appealed a permit condition limiting the amount of carbon monoxide that could be emitted from the proposed facility.  The circuit court affirmed the Board's decision in all respects.  The citizens groups now appeal the issuance of the permit, and Hyperion appeals the permit's carbon monoxide limit.  We affirm.

*Facts and Procedural History*

[¶2.]      This case involves the issuance of a "Prevention of Significant Deterioration Air Quality" permit (PSD permit) to Hyperion.  Hyperion proposed to construct a large petroleum refinery and power plant in Union County.[1]  Federal and state regulations required Hyperion to obtain a PSD permit before constructing the facility.  Among other things, a PSD permit regulates air quality by limiting the pollutants a facility may emit into the ambient air.

[¶3.]      In December 2007, Hyperion submitted a PSD permit application containing 613 pages of materials to DENR.  Three citizens groups—Save Union

---

1.      Hyperion's proposed facility includes a refinery and a power plant.  Hyperion proposed to refine Canadian crude from oil sands into ultralow sulfur gasoline, heating oil, diesel fuel, and low sulfur jet fuel.  The power plant would provide most of the electricity needed by the refinery.  Additional electricity would be purchased commercially.

County, Citizens Opposed to Oil Pollution, and the Sierra Club (collectively, "Citizens")—intervened and contested issuance of the permit.

[¶4.] Citizens also requested that a state environmental impact statement (EIS) be prepared before the permit was issued. DENR, the state agency in charge of preparing EISs and considering PSD permits, denied Citizens' request. On December 15, 2008, after extensive study and responses to public comments, DENR recommended approval of a PSD permit with ninety-six pages of conditions.

[¶5.] DENR's recommendation was challenged, and in the summer of 2009, the proposed permit was litigated in ten days of contested case hearings before the Board. Twice during the hearings, Citizens renewed their request for an EIS. The requests were denied.[2] On August 20, 2009, the Board authorized DENR to issue the permit.

[¶6.] One permit condition imposed a "commence construction" deadline of eighteen months, which was February 20, 2011. The permit provided that, if construction of the facility was not commenced by that date, the permit "[became] invalid." The permit, however, allowed DENR's Secretary to grant an extension of time to commence construction if Hyperion applied for the extension within the eighteen-month time period and demonstrated that the extension was justified.

---

2.  Citizens requested the Board to review DENR's decision to not order an EIS. Citizens also requested the Board to order an EIS. In its findings of fact and conclusions of law, the Board ruled that "an EIS is not necessary for consideration in this matter, and the DENR properly exercised its authority and discretion [in] choosing not to perform an EIS." DENR contends that the Board had no authority to review DENR's decision. We do not address that contention because we conclude that neither the Board nor DENR abused its discretion in declining to order an EIS.

[¶7.]     Another permit condition required that carbon monoxide emissions from the proposed facility's twenty large "process heaters" could not exceed certain "Best Available Control Technology" (BACT) limits. BACT limits are designed to require the maximum degree of reduction of pollutant emissions that is achievable. The permit imposed a carbon monoxide BACT limit of 0.007 lb/mmBtu (pounds per million British thermal units) for the process heaters.

[¶8.]     Citizens appealed the issuance of the permit to circuit court. Hyperion filed a separate appeal challenging the carbon monoxide BACT limit. Hyperion argued that 0.010 lb/mmBtu was the achievable limit.

[¶9.]     On June 23, 2010, while the appeals were pending, the circuit court granted a Hyperion motion to remand the matter to allow the Board to consider additional evidence on several issues, including a request to extend the commence construction deadline. On the same date, Hyperion filed an application with DENR to extend the commence construction deadline to August 20, 2012.

[¶10.]     DENR then began the process of investigating, soliciting public comments, and considering new evidence on the new issues and the request to extend the commence construction deadline. Over the next eight months, DENR made numerous requests of Hyperion for additional information to address the new issues and the request for an extension.[3] DENR ultimately proposed a draft amended permit, which included an extension of the commence construction deadline. The draft amended permit was made available for public comment on

_____

3.     All requested information was submitted by February 14, 2011.

February 14, 2011, six days before the original commence construction deadline was to expire. The public comment period ran from February 14, 2011, to April 1, 2011.

[¶11.]     On March 21, 2011, the Board entered a scheduling order. The order set a July 2011 contested case hearing to consider the proposed amended permit. On March 31, 2011, Hyperion filed its comments on the draft amended permit. In its comments, Hyperion requested that the commence construction deadline be extended to eighteen months after the Board approved the amended permit.[4]

[¶12.]     After public comments and DENR's response to public comments, a four-day contested case hearing on the amended permit was held in July 2011. Extensive expert testimony and nearly 4,000 pages of exhibits were presented to the Board. Hyperion indicated that it had not commenced construction because of the national economic downturn; the need to address new federal regulations regarding sulfur dioxide and nitrogen dioxide emissions; the identification of a new emission source that required correction of the initial permit; and the uncertainty of the permit's status as a result of the ongoing litigation.

[¶13.]     On September 16, 2011, the Board entered findings and conclusions approving DENR's issuance of the amended permit. The amended permit incorporated Hyperion's request to extend the commence construction deadline to eighteen months after the effective date of the amended permit. The amended permit retained the carbon monoxide 0.007 lb/mmBtu BACT limit.

---

4.     Neither DENR nor the Board formally and finally acted on this request for an amended commenced construction deadline until the conclusion of the contested case proceedings.

[¶14.] Citizens then appealed the Board's September 2011 decision. The circuit court consolidated the 2011 appeal with Hyperion's and Citizens' 2009 appeals. In a detailed memorandum decision, the court ultimately affirmed the decisions not to order an EIS, affirmed the determination that Hyperion presented satisfactory justification for the extension of the commence construction deadline, affirmed the issuance of the amended permit, and affirmed the carbon monoxide 0.007 lb/mmBtu BACT limit.

[¶15.] We consider the following issues raised by Citizens:

1. Whether an EIS should have been ordered before the issuance of the PSD permit.

2. Whether the initial permit "became invalid" when the Board neither ruled on Hyperion's request to extend the commence construction deadline within the original eighteen-month period nor adopted the ultimate deadline that was requested within that period.

3. Whether Hyperion presented satisfactory justification for its request to extend the commence construction deadline.

We consider the following issue raised by Hyperion:

4. Whether the Board clearly erred in determining the carbon monoxide BACT limit.

*Decision*

[¶16.] "We review agency decisions the same as the circuit court . . . ." *St. Pierre v. State ex rel. S.D. Real Estate Comm'n*, 2012 S.D. 25, ¶ 14, 813 N.W.2d 151, 156. We "give great weight to the findings made and inferences drawn by an agency on questions of fact." SDCL 1-26-36. "[Q]uestions of law are reviewed de novo." *Brown v. Douglas Sch. Dist.*, 2002 S.D. 92, ¶ 9, 650 N.W.2d 264, 267. We may reverse agency decisions when "substantial rights of the appellant have been

prejudiced because the administrative findings, inferences, conclusions, or decisions" are, among other things, in violation of statutes, affected by an error of law, are clearly erroneous, or constitute an abuse of discretion. SDCL 1-26-36.

### 1. Environmental Impact Statement

[¶17.] SDCL chapter 34A-9 is South Dakota's Environmental Policy Act. SDCL 34A-9-4 provides in relevant part: "All agencies may prepare, or have prepared by contract, an environmental impact statement on any major action they propose or approve which may have a significant effect on the environment."[5] However, the Act is separate from, and involves environmental concerns in addition

---

5.     The Board and DENR are "agencies." *See* SDCL 34A-9-1 (defining an "[a]gency" as "the executive and administrative departments, offices, boards, commissions, and other units of the state government"). The parties, however, disagree whether issuing a PSD permit is an "action" that allows both agencies to order an EIS under SDCL chapter 34A-9. Citizens argue that SDCL 34A-9-2(3) specifically defines the issuance of a PSD permit as an agency "action." That statute provides: "As used in [chapter 34A-9], the term, actions, includes . . . [t]he issuance by one or more public agencies of a lease, permit, license, certificate, or other public entitlement to an applicant." SDCL 34A-9-2. The Board and Hyperion argue that issuing a PSD permit is not an agency "action." They rely on SDCL 34A-9-3(5), which provides: "As used in [chapter 34A-9], the term, actions, does not include . . . [a]ctions of an environmentally protective regulatory nature." The Board and Hyperion contend that PSD permits are environmentally protective regulations.

Environmentally protective regulations are substantially different than PSD permits. A permit (like the PSD permit) is issued to an individual party (like Hyperion), authorizing that party to engage in a particular activity. In contrast, environmentally protective regulations have broad non-individualized application. Regulations apply to the citizenry as a whole. Because a PSD permit only authorizes an identified permit holder to engage in identified activities, it is not an environmentally protective regulation within the meaning of SDCL 34A-9-3(5). We also note that SDCL 34A-9-2(3) is the more specific statute. We conclude that PSD permitting is governed by SDCL 34A-9-2(3), which specifically makes permitting an agency "action." The Board and DENR were authorized to order an EIS before issuing Hyperion's PSD permit.

to those that are relevant in PSD air quality permitting. *Compare* South Dakota Environmental Policy Act's broad application to any action that may have a significant impact on the environment *with* ARSD 74:36:09:02's provisions only involving air quality.

[¶18.]     Citizens first argue that the Board erroneously determined it had no jurisdiction to order an EIS under SDCL chapter 34A-9. Citizens misconstrue the Board's determination. The Board did not determine that it had no jurisdiction to order an EIS. The Board determined that "an EIS is much broader and encompasses many subject matters over which the Board has no jurisdiction." We agree with the Board's determination.

[¶19.]     Citizens acknowledge that, in addition to an assessment of air quality, an EIS would assess the proposed project's other environmental effects, such as effects on roads, soils, water resources, noise, waste disposal, etc. But the only "action" proposed to be approved was the issuance of a PSD permit. *See* SDCL 34A-9-2, -4. Therefore, the Board's jurisdiction *in this proceeding* did not include regulatory authority over "all the [other environmental] factors which the [Citizens] deem relevant to the [permit] consideration." *See In re Solid Waste Disposal Permit Application*, 268 N.W.2d 599, 601 (S.D. 1978). The Board's jurisdiction was limited to the specific requirements established in the statutes and regulations for issuance of the air quality permit. *See id.* at 600-01. Thus, the Board correctly recognized that its jurisdiction was limited to the PSD permit issues, and the Board had no jurisdiction to regulate the other environmental effects of the proposed facility in this PSD proceeding.

[¶20.]     Citizens also argue that the Board and DENR abused their discretion in determining that an EIS was not necessary. Under SDCL 34A-9-4, "an EIS is optional, not mandatory." *In re SDDS, Inc.*, 472 N.W.2d 502, 507 (S.D. 1991). *See also In re S.D. Water Mgmt. Bd. Approving Water Permit No. 1791-2*, 351 N.W.2d 119, 124 (S.D. 1984) (concluding that the EIS statute "evidence[s] a legislative intent not to require an environmental impact statement every time [the] Board rules on a . . . permit"). "Since the [decision to order an EIS] is one which lies in the discretion of the agency, we can reverse its decision only if it reflects a clearly unwarranted exercise of discretion." *In re SDDS*, 472 N.W.2d at 507.

[¶21.]     The purpose of an EIS is "to inform the public and other public agencies as early as possible about proposed actions" and "to solicit comments which will assist the agency in determining the environmental consequences of the proposed action." SDCL 34A-9-6. These purposes were addressed in the Board's and DENR's administrative process. That process included a detailed technical review of Hyperion's permit application, publication of the proposed action, DENR's solicitation and response to public comments, and consideration of the evidence presented at the contested case hearings.

[¶22.]     DENR first performed an extensive technical review of Hyperion's application. After issuing public notices of the application and DENR's proposed action, DENR then received extensive commentary from the public, other agencies, and environmental groups. Those commenting included the United States Department of Interior, the United States Environmental Protection Agency (EPA), and Plains Justice. DENR then considered the comments, issued responses, and

made changes to the proposed permit. In its response to comments, DENR noted that an EIS was unnecessary because "the procedural and substantive requirements for obtaining an air quality permit provide the agency [with] information that is functionally equivalent to the *relevant* information that would be provided by an environmental impact statement." (Emphasis added.)

[¶23.] A public contested hearing was then held before the Board. The Board considered the filed comments and DENR's responses. The Board heard the extensive evidence for and against the project. The Board considered alternatives to Hyperion's proposed equipment. The Board assessed the facility's proposed design and operational limits. The Board reviewed Hyperion's additional impacts analysis and determined that "no adverse impacts are expected to air quality, visibility, or soils and vegetation as a result of [Hyperion's proposed facility] and associated commercial, residential, and industrial growth."

[¶24.] The Board also considered expert testimony on the need for an EIS. Kyrik Rombough, DENR's Natural Resources Engineering Director, was the lead permit writer for the PSD permit program. Since beginning work at DENR, he had processed and reviewed hundreds of air quality permits. Rombough testified that DENR's review of Hyperion's permit application indicated an EIS was unnecessary. Colin Campbell, Hyperion's expert, oversaw air permitting projects and worked with state agencies in implementing air permitting programs. He testified that, when he was involved in Arizona's and Utah's air permitting processes, neither state required EISs. He also testified that, based on his experience, EISs were not typically prepared for similar projects, such as refinery expansions.

[¶25.] The federal EIS experience is also instructive. Under the National Environmental Policy Act, EISs are generally mandated. 42 U.S.C.A. § 4332(c) (West 2012). Nevertheless, federal air quality permits, including PSD permits, are exempt from the mandate. 15 U.S.C.A. § 793(c)(1) (West 2012); 40 C.F.R. § 124.9(b)(6). *See also In re Knauf Fiber Glass*, 8 E.A.D. 121, 35 (EAB 1999). We acknowledge that the federal statutory exemption does not control the discretionary decision under SDCL 34A-9-4. But the federal law's exemption does suggest that Congress determined EISs are generally not required to protect the environment in determining entitlement to PSD air quality permits.

[¶26.] Finally, we note the record reflects that other environmental concerns typically addressed in an EIS will not be overlooked. Although an EIS was not prepared in the air quality permitting portion of this regulatory proceeding, the record indicates that other EIS concerns will be addressed in other regulatory proceedings that are necessary to construct and operate the proposed facility. In denying the Citizens' request for an EIS, the Secretary of DENR explained:

> We [ ] disagree with your assertions that other environmental concerns, such as water withdrawals, water use, groundwater, surface water, water quality, stormwater, waste disposal, wastewater, and spill response, will not be considered. While these issues are not addressed in the draft [PSD permit] that is currently under review, those other environmental issues will be fully considered when Hyperion complies with a host of other permitting and regulatory processes, such as a water right permit, discharge permits, waste disposal permit, etc. . . .[6]

---

6. At oral argument, the Court was informed that Hyperion will most likely be required to obtain a federal "404 permit" for the proposed facility's surface water discharges. The Court was further informed that, in most circumstances, the United States Army Corp of Engineers must prepare

(continued . . .)

-10-

[¶27.]     In sum, the Board's and DENR's decisions to deny the requests for an EIS were supported by DENR's technical review of Hyperion's application and other agency and public comments; DENR's response to those agency and public comments; and the testimony and environmental evidence considered in the administrative process.[7]  We conclude that the Board and DENR did not abuse their discretion in denying the requests for an EIS.

   *2. Validity of the Permit*

[¶28.]     Citizens point out that original permit condition 2.1 imposed a commence construction deadline of February 20, 2011.  Citizens argue that the permit expired because Hyperion did not commence construction or obtain an extension before that initial deadline.  Citizens also argue that because the amended deadline ultimately adopted was not requested within the initial eighteen-month period, the Board was without authority to authorize that amended deadline.  Citizens rely on the language of original permit condition 2.1, ARSD 74:36:09:02, and 40 C.F.R. section 52.21(r)(2).

[¶29.]     The interpretation of a permit is analogous to the interpretation of a contract or statute.  "Contract and statutory interpretation are questions of law we review de novo." *AFSCME Local 1025 v. Sioux Falls Sch. Dist.*, 2011 S.D. 76, ¶ 11, 809 N.W.2d 349, 352.  "Administrative regulations are subject to the same rules of

---

(. . . continued)
       either an EIS or Environmental Assessment when determining whether to
       issue a 404 permit.  *See* 33 C.F.R. § 336.1(b)(6).

7.     On appeal, Citizens have not contended that the Board erred in refusing any
       offered environmental evidence.

construction as are statutes." *WestMed Rehab, Inc. v. Dep't of Soc. Servs.*, 2004 S.D. 104, ¶ 8, 687 N.W.2d 516, 518.

[¶30.]     Condition 2.1 imposed a commence construction deadline but allowed extensions. Condition 2.1 provided:

> In accordance with ARSD 74:36:09:02, as referenced to 40 C.F.R. § 52.21(r)(2), the owner or operator shall commence construction within 18 months of the effective date of this permit. If construction is delayed or interrupted for a period of 18 months or more this permit becomes invalid. The owner or operator may apply, before the end of the 18-month period, to the Secretary [of DENR] for an extension. The Secretary may grant an extension after the owner or operator satisfactorily demonstrates that an extension is justified.

Condition 2.1 is premised upon ARSD 74:36:09:02,[8] which incorporates 40 C.F.R. section 52.21(r)(2).[9]

[¶31.]     There is no dispute that Hyperion did not commence construction by February 20, 2011. Citizens' first argument is that, even though Hyperion's initial extension application was filed within the eighteen-month time to commence

---

8.     ARSD 74:36:09:02 provides, that "the state's definitions and requirements for the prevention of significant deterioration are those in 40 C.F.R. § 52.21 . . . ."

9.     40 C.F.R. section 52.21(r)(2) provides:

> Approval to construct shall become invalid if construction is not commenced within 18 months after receipt of such approval, if construction is discontinued for a period of 18 months or more, or if construction is not completed within a reasonable time. The Administrator may extend the 18-month period upon a satisfactory showing that an extension is justified. This provision does not apply to the time period between construction of the approved phases of a phased construction project; each phase must commence construction within 18 months of the projected and approved commencement date.

construction, the permit became invalid because the Board did not grant the extension until after the initial eighteen-month period expired.[10] Citizens point out that condition 2.1 and 40 C.F.R. section 52.21(r)(2) do not explicitly state that the original permit remains in effect or that the permit's expiration is stayed while the Secretary considers a request for an extension. Thus, Citizens contend that when the Secretary failed to grant an extension before the expiration of the initial commence construction deadline, the original permit automatically expired, precluding any amendment.[11] Citizens contend that the original and amended

10. Hyperion and DENR argue that SDCL 1-26-28 extended the validity of Hyperion's permit while the application for an extension was pending. SDCL 1-26-28 provides:

> If a licensee has made timely and sufficient application for *renewal* of a license or a *new* license with reference to any activity of a continuing nature, the existing license, or a right to continue the activity, does not expire until the application has been finally determined by the agency and for ten days following receipt, or failure to accept delivery, of notice of such determination by the licensee.

(Emphasis added.) A permit is a "license" for purposes of this statute. *See* SDCL 1-26-1(4). However, SDCL 1-26-28 did not apply to Hyperion's application for the extension. Hyperion requested that condition 2.1 be *amended* to extend the construction deadline. Hyperion did not request a "renewal" or a "new" permit. *See id.*

11. Citizens rely on *Sierra Club v. Franklin County Power of Illinois, LLC*, 546 F.3d 918 (7th Cir. 2008). However, in *Franklin County*, no extension application had been filed. The dispute was whether a permittee had "commenced construction" by entering a construction memorandum and conducting engineering research and excavation work. *Id.* at 929-31. *Franklin County* does not support Citizens' argument that PSD permits automatically expire even though a timely extension application is pending.

Citizens also argue that Hyperion was required to request a temporary extension when it appeared that DENR would be unable to act on the

(continued . . .)

permits cannot be upheld because "it is beyond the role of the courts to supply omitted language" authorizing PSD permits to remain in effect until the Secretary rules on extension requests.

[¶32.] The language of 40 C.F.R. section 52.21(r)(2) and condition 2.1 cannot, however, be read to require an automatic expiration of the PSD permit if a timely application for extension is pending and the Secretary is unable to rule on the application within the original time limit. It must be noted that 40 C.F.R. section 52.21(r)(2) does not impose any time limits for filing extension requests, and condition 2.1 allowed the extension request to be filed *any time* before the eighteen-month period expired. It must also be noted that both the condition and the rule contemplate that the Secretary must have time to consider additional evidence before deciding extension requests. Condition 2.1 provides that the Secretary may grant an extension only "*after* the owner or operator *satisfactorily demonstrates* that an extension is justified." (Emphasis added.) Similarly, 40 C.F.R. section 52.21(r)(2) authorizes extensions only "upon a satisfactory *showing* that an extension is justified." (Emphasis added.) Thus, the condition and rule allow extension requests to be filed up to the last day of the eighteen-month period, but require the extension to be preceded by a satisfactory showing that the extension is justified. We conclude the rule and condition necessarily contemplated that a final decision may not necessarily be made within the initial deadline.

---

(. . . continued)
    requested extension within the initial eighteen-month deadline. We decline to consider this argument. Citizens presented no authority allowing DENR to grant temporary extensions without determining whether the extension was justified.

[¶33.] Indeed, it may be impossible to obtain a final ruling on an extension request within the original deadline. As this case demonstrates, extension requests may be complicated matters that require extensive time to administratively resolve. Because an extension request seeks to amend a condition of a PSD permit, the request must be processed under the same administrative procedure as a permit application, which requires lengthy administrative proceedings. And if the initial permit is on appeal, the administrative process must be preceded by filing a motion with the reviewing court to seek the permit's return to the Board to allow the consideration of additional evidence. *See Jundt v. Fuller*, 2007 S.D. 62, ¶ 7, 736 N.W.2d 508, 512. If the reviewing court grants the motion, the permit holder must then apply for an extension with the Secretary. Next, the Secretary must recommend an amended permit, publish the proposed permit, and provide time for a contested case hearing. *See* ARSD 74:36:09:03. Finally, interested parties may litigate the matter before the Board. Considering the many months necessary to complete this administrative process, it would be impossible to obtain a final ruling on many extension requests within the initial eighteen-month period, even requests filed early within the initial eighteen-month period.

[¶34.] In this case, Hyperion submitted its initial extension application on June 23, 2010. During its review of the application, DENR requested additional information from Hyperion. DENR's draft amended permit was not made available for public comment until February 14, 2011, six days before the initial deadline was to expire. DENR received over 350 public comments on the draft amended permit, and DENR responded to those comments when issuing its final proposed amended

permit. A contested case hearing was requested, and on March 21, 2011, the Board scheduled a contested case proceeding for July 25, 2011, over thirteen months after the initial extension request. The Board heard closing arguments on September 15, 2011, and issued its findings of fact and conclusions of law on September 16, 2011. In total, the administrative process took almost fifteen months to complete, not counting the time necessary to resolve appeals of the Board's decision in the courts.

[¶35.]      Considering the realities of environmental permitting, Citizens' interpretation of 40 C.F.R. section 52.21(r)(2) and condition 2.1 leads to an absurd result. Because of the lengthy time necessary to obtain a final ruling on an extension request in complicated cases, few, if any, such extension requests could be considered under Citizens' interpretation. Citizens' interpretation of condition 2.1 would abrogate what condition 2.1 and 40 C.F.R. section 52.21(r)(2) expressly authorize: an opportunity to obtain an extension after a timely application and a full consideration by the Secretary and the Board of conflicting evidence relating to the request. We conclude that the permit did not become invalid solely because the Secretary was procedurally unable to grant a final extension within the original eighteen-month period. We do not interpret language to reach an absurd result. *State v. Robert*, 2012 S.D. 27, ¶ 10, 814 N.W.2d 122, 125.

[¶36.]      Citizens, however, contend that allowing the Secretary an indefinite timeframe to rule on an extension request thwarts the purposes of the deadline. According to DENR's and Hyperion's experts, there are two reasons for the eighteen-month deadline. First, the deadline ensures that BACT determinations are current. *See Ky. Mountain Power, LLC v. Energy & Env't Cabinet*, No. DAQ-

29109-039, 2009 WL 6214729, at *38 (Ky. Envtl. & Pub. Protection Cabinet Dec. 1, 2009) ("[D]ecisions about pollution control methods and associated emissions limitations are made based on the most current information possible."). Second, the deadline ensures that permit holders do not, by delay or inaction, obtain longer time periods than allowed to build new facilities, thereby unnecessarily tying up a state's air resources and industrial growth rights.

[¶37.]     The additional time taken by the Secretary did not frustrate these purposes. When preparing the draft amended permit, DENR reevaluated BACT limits and reviewed new regulations, which ensured that the BACT determinations were up to date. DENR also required modeling to ensure the proposed facility would comply with new emission standards. Finally, there was no evidence that Hyperion had tied up the State's air resources or restricted any other competing industrial growth.

[¶38.]     Citizens also argue that, even if the Board was authorized to grant Hyperion's initial extension application after the eighteen-month period had expired, the finally adopted extension was invalid. Citizens contend that the finally adopted extension was invalid because Hyperion did not make that particular extension request before the initial eighteen-month deadline had expired. This argument overlooks the nature of the finally adopted request in the context of the required administrative proceedings.

[¶39.]     Hyperion's initial June 2010 request for an August 20, 2012 extended deadline was made within the original eighteen-month period. But the Secretary did not act on Hyperion's request until he issued a proposed draft amended permit

and notice of opportunity for public comment on February 14, 2011. At that point, the public notice comment period remained open until April 1, 2011, well after the initial commence construction deadline would expire. On March 31, 2011, Hyperion filed its comments to DENR's draft amended permit. In those comments, Hyperion requested that the deadline be extended to eighteen months after the amended permit was ultimately issued. Hyperion indicated that it amended its request for an extension "in light of the unpredictable timeline associated with the approval of the amended permit." Thus, Hyperion made a timely application for an extension; Hyperion was aware that DENR was recommending that an extension be granted; but the original deadline was expiring and substantial additional time would be needed before Hyperion would receive a final determination on the extension request. Under these circumstances, Hyperion's amended request for an extension, made within the proceeding to determine the initial extension request, was an amendment that did not constitute a new and therefore untimely application. *Cf. Bitterroot River Protective Ass'n v. Siebel*, 108 P.3d 518, 522, 524 (Mont. 2005) (holding that amendments to substantially deficient water appropriation applications constituted new applications because the "changes were so significant that the amended applications bear[ed] little resemblance, if any, to the original applications[,]" and therefore, the amendments did not relate back to the date of the timely filed deficient applications).

[¶40.] We conclude that DENR and the Board were not required to render a final decision on the initial timely extension request within the initial eighteen-month period. Further, the subsequent amendment to the request was made

during the extension proceedings, and that amendment was not so different as to constitute a new application. Therefore, Hyperion's permit did not become invalid.

### 3. *Justification to Extend the Commence Construction Deadline*

[¶41.] Citizens argue that Hyperion did not sufficiently justify its request for an extension of the commence construction deadline. Citizens contend that the Board's contrary determination was clearly erroneous. "For an agency finding of fact to be clearly erroneous, a court must be definitely and firmly convinced, after reviewing all the evidence, that the agency made a mistake." *McKibben v. Horton Vehicle Components, Inc.,* 2009 S.D. 47, ¶ 11, 767 N.W.2d 890, 894. "However, we defer to the agency on the credibility of a witness who testified live because the agency 'is in a better position . . . to evaluate the persuasiveness of [witness] testimony.'" *Id.* (second alteration in original) (quoting *Lends His Horse v. Myrl & Roy's Paving, Inc.,* 2000 S.D. 146, ¶ 15, 619 N.W.2d 516, 520). *See also Burke v. Butte Cnty.,* 2002 S.D. 17, ¶ 16, 640 N.W.2d 473, 478 (stating that "[the agency] is entitled to weigh the credibility of the witnesses and is free to choose between conflicting testimony").

[¶42.] In its 2011 findings of fact and conclusions of law, the Board found that Hyperion presented satisfactory justification for the extension.

> The Board determines that the evidence submitted in support of Hyperion's request for an extension of the commence construction deadline is justified given the economic recession, which caused delays in development of large capital projects such as [Hyperion's proposed facility], the pending appellate process regarding the status of the permit, the recent discovery of the additional emission unit for [Hyperion's proposed facility],

the coker quench water system, as well as the additional
National Ambient Air Quality Standards for SO2 and NO2.

The record supports this finding.

[¶43.]     At the 2011 contested hearing, a Hyperion vice-president testified that the recession affected Hyperion's ability to begin constructing the facility. He also indicated that the uncertainty of the permit's status and the need to address two new federal emission requirements justified an extension. The vice-president finally indicated that Hyperion had recently identified a "coker quench" water system as an additional emission source, and therefore, Hyperion needed an extension to obtain an amended permit to include that emission source.

[¶44.]     Citizens, however, contend that Hyperion did not specifically identify how the economic recession and the ongoing litigation affected Hyperion's ability to meet the commence construction deadline. Citizens also contend that Hyperion contributed to the uncertainty of the permit's status because Hyperion itself appealed the BACT limit for the process heaters. Further, Citizens contend that the two new federal emission requirements did not justify an extension because those new requirements would not have applied if Hyperion had not requested to amend its permit. Finally, Citizens contend that Hyperion had ample time to correct the coker quench water system oversight before the initial deadline expired.

[¶45.]     Although Citizens cross-examined Hyperion's vice-president regarding the reasons for the extension, the Board was best suited to determine the credibility of the vice-president and the weight to be given to his testimony. Further, Citizens provided no contradicting testimony. Therefore, after reviewing the entire record, we are not definitely and firmly convinced that the Board made a mistake. The

Board did not clearly err in finding satisfactory justification for extension of the commence construction deadline.

### 4. Carbon Monoxide "Best Available Control Technology" Limit

[¶46.]    Large process heaters at Hyperion's proposed facility will burn refinery gas to heat equipment used in the refinery process. There is no dispute that a carbon monoxide BACT limit is required for the heaters. The dispute is the achievable BACT limit.

[¶47.]    ARSD 74:36:09:02 incorporates 40 C.F.R. section 52.21(b)(12), which defines the "best available control technology" for limiting regulated pollutant emissions at the proposed facility:

> Best available control technology means an emissions limitation (including a visible emission standard) based on the maximum degree of reduction for each pollutant subject to regulation . . . which would be emitted from any proposed major stationary source or major modification which the Administrator, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such pollutant. . . .

To establish a proper BACT limit for a permit under this rule, the proposed limit must be shown to be both: 1) the maximum degree of reduction of a pollutant subject to regulation (considering energy, environmental, and economic impacts and other costs), and 2) achievable for such source. *Id.* A BACT limit is achievable if the facility, when operating, is able to comply with that emission limit.

[¶48.]    DENR proposed the 0.007 lb/mmBtu BACT limit, which the Board adopted. Hyperion argues that limit is not supported by evidence and is

unachievable for its facility. Hyperion argues that a 0.010 lb/mmBtu limit is supported by the evidence. Hyperion contends that the Board clearly erred in adopting DENR's proposed limit. We "give great weight to the findings of the agency and reverse only when those findings are clearly erroneous in light of the entire record." *Williams v. S.D. Dep't of Agric.*, 2010 S.D. 19, ¶ 5, 779 N.W.2d 397, 400.

[¶49.]     Because a PSD permit must be issued before construction is initiated, the achievable BACT limit is based on agency review of estimates and projections of pollutants that will be emitted by the proposed facility.[12]  These estimates and projections are based on engineering analysis, computer modeling, and regulatory data from other states and the EPA.  DENR supported its proposed 0.007 lb/mmBtu limit by evidence of other facilities' emission limits.  The Board adopted DENR's proposed 0.007 lb/mmBtu limit, finding that DENR's proposed limit was based on performance testing and other permits.  The Board also found that the 0.007 lb/mmBtu limit was achievable.

[¶50.]     Hyperion argues that the Board clearly erred in relying on DENR's evidence.  Hyperion contends that the other facilities and their carbon monoxide emission limits were not comparable to Hyperion's proposed facility.

[¶51.]     Kyrik Rombough, DENR's Natural Resources Engineering Director, testified at the 2009 hearing.  He testified that he converted emission limit

---

12.     After a PSD permit is issued and the facility is constructed, the facility's operator must apply for a "Part 70" (a/k/a "Title V") operating permit within the first year of operation.  ARSD 74:36:05:08.  It is not until that time that actual emissions data from performance tests exist to demonstrate compliance with emissions limits.  ARSD 74:36:05:06.

measurements used by the reviewed facilities to the "lb/mmBtu" emission limit measurement imposed in this permit. Rombough indicated that after the conversion, the other facilities' emission limits were equivalent to the 0.007 lb/mmBtu limit. Hyperion challenges the comparison of the emission limit measurements from other facilities.

[¶52.] Hyperion first challenges DENR's reliance on the Baytown refinery in Texas. Hyperion points out that Baytown was an ethylene production facility, unlike Hyperion's proposed oil refinery. Hyperion also points out that Baytown's carbon monoxide BACT limit was revised and is currently less stringent than Hyperion's proposed 0.010 lb/mmBtu limit. However, Rombough testified that the fuels burned in Baytown's process heaters were similar to Hyperion's proposed fuels. Rombough further testified he had verified with the Texas permitting agency that Baytown's achievable limit was equivalent to a 0.007 lb/mmBtu limit.

[¶53.] Hyperion also challenges DENR's reliance on the CENCO refinery. Hyperion contends that this facility never operated, and therefore, its ability to achieve a limit equivalent to 0.007 lb/mmBtu was not substantiated through performance tests. Rombough acknowledged that CENCO never operated. Rombough, however, indicated that CENCO's limit—a limit that converted to a 0.007 lb/mmBtu limit—was based on two operational facilities (TOSCO and All Air Products) whose permits required a limit equivalent to 0.007 lb/mmBtu. Rombough also testified that he had analyzed a TOSCO performance test, which indicated that TOSCO had complied with an emission limit equivalent to the 0.007 lb/mmBtu limit. Although Hyperion relies on its expert, who opined that these facilities were

not comparable because of differences in the refinery fuel gases, the Board was best suited to adopt the expert's testimony that the Board believed was more persuasive.

[¶54.]    Hyperion finally contends that the Board erred in relying on the Big West refinery because it was never permitted or built. However, in Big West's application for a PSD permit, the applicant itself asserted that a 0.007 lb/mmBtu limit was achieved by process heaters burning refinery gas in testing conducted by California. Although Big West never operated, the evidence reflects that the limit was determined by performance testing. Again, the Board was in the best position to accept or reject the comparability of the evidence with respect to Big West.[13]

[¶55.]    We also note that Hyperion's permit was reconsidered by the Board in the 2011 contested case proceedings. DENR had reevaluated Hyperion's BACT limit to ensure that it was current. DENR considered updated data, new permits, and new regulations regarding BACT limits. Both DENR and the Board reaffirmed the 0.007 lb/mmBtu limit in light of new developments regarding carbon monoxide BACT limits.

[¶56.]    Hyperion, however, contends that publication of new EPA regulations before the 2011 hearing substantiated its inability to achieve a 0.007 lb/mmBtu limit.[14] Hyperion points out that some of the EPA regulations, using a different

---

13.    In its findings, the Board acknowledged that Big West's application was withdrawn and no performance data existed for that facility. The Board also acknowledged that the EPA "cautions against the use of cancelled permits for BACT analysis." The Board, however, did not indicate that the actual performance testing used in Big West's application was suspect.

14.    DENR argues that Hyperion's evidence regarding new EPA evaluations of emissions data provided in the amended permit proceeding is not reviewable

(continued . . .)

numerical limit, indicate upper predictive carbon monoxide limits that were higher than the limit adopted by the Board. Hyperion argues that the DENR's reliance on the EPA's lower limits was misplaced because the lower limits were averages and an average emission level does not indicate an "achievable" limit over an extended period of operation.

[¶57.] DENR, however, explained that when the new EPA background testing data was converted for comparison purposes, it revealed 423 test results at new facilities with limits less than the EPA average. Therefore, in DENR's view, the new regulations supported a 0.007 lb/mmBtu BACT limit. Further, Rombough testified that the EPA employed a limits testing method that differed from Hyperion's method. The Board adopted DENR's view, finding that Hyperion's limit "contain[ed] both filterable and condensable particulate matters, whereas EPA's new regulation only include[d] filterable material."

[¶58.] We acknowledge that Hyperion presented testimony supporting its proposed limit. We also acknowledge that some of DENR's comparative evidence was subject to different interpretations. But ultimately, the comparability of other facilities involved conflicting evidence. As previously noted, under these

_____

(. . . continued)
      because Hyperion did not specifically raise the issue at the 2011 contested hearing. However, the carbon monoxide emission limit remained in issue since the 2009 hearing. In fact, Hyperion's appeal of the imposed limit following the 2009 hearing was still pending at the time of the 2011 hearing. Further, Hyperion gave notice that it was continuing to contest the 2009 decision, and Hyperion submitted evidence on this contested issue in its September 2010 letter responding to DENR's request that Hyperion review the EPA's evaluations. Therefore, the issue was raised at the Department level and may be reviewed by this Court. *See Stuckey v. Sturgis Pizza Ranch*, 2011 S.D. 1, ¶ 19 n.3, 793 N.W.2d 378, 386 n.3.

circumstances, we "defer to the agency on the credibility of a witness who testified live because the agency 'is in a better position . . . to evaluate the persuasiveness of [witness] testimony.'" *McKibben*, 2009 S.D. 47, ¶ 11, 767 N.W.2d at 894 (second alteration in original) (quoting *Lends His Horse*, 2000 S.D. 146, ¶ 15, 619 N.W.2d at 520). The Board did not clearly err in deciding that the 0.007 lb/mmBtu BACT limit was achievable for Hyperion's project.

[¶59.] Affirmed.

[¶60.] GILBERTSON, Chief Justice, and KONENKAMP and SEVERSON, Justices, and CALDWELL, Retired Circuit Court Judge, concur.

[¶61.] CALDWELL, Retired Circuit Court Judge, sitting for WILBUR, Justice, disqualified.