2017 IL App (1st) 160999

FIRST DIVISION
March 27, 2017

No. 1-16-0999

| | | |
|---|---|---|
| AMALGAMATED TRANSIT UNION, LOCAL 241, | ) ) ) | |
| Petitioner, | ) ) ) | Petition for Review of an Order of the Illinois Labor Relations Board Local Panel |
| v. | ) ) | Labor Relations Board |
| THE ILLINOIS LABOR RELATIONS BOARD, LOCAL PANEL and THE CHICAGO TRANSIT AUTHORITY, | ) ) ) | Local Panel No. L-CA-14-022 |
| Respondents. | ) ) | |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Presiding Justice Connors and Justice Harris concurred in the judgment and opinion

**OPINION**

¶ 1     The Amalgamated Transit Union, Local 241 (Union), brought an unfair labor practice charge against the Chicago Transit Authority (CTA) for violating the parties' collective bargaining agreement and failing to bargain with the Union when the CTA implemented an open fare payment collection system, known as Ventra. The Ventra contract resulted in the CTA eliminating Union positions and subcontracting what had been Union jobs to a private company. The Illinois Labor Relations Board (Board) dismissed the unfair labor practice complaint based on the subcontracting of Union jobs as untimely because the charge was not filed within six months of the date that the Union received a copy of a request for proposals (RFP) for Ventra from the CTA. The Board then dismissed the rest of the complaint because it determined that the elimination of Union positions was not a mandatory subject of bargaining. The Union appealed the Board's decision to this court directly. For the following reasons, we hold that the Union's

charge as to subcontracting was timely filed and remand for further consideration by the Board of all of the Union's claims within its charge.

¶ 2                               BACKGROUND

¶ 3                            A. The Stipulated Facts

¶ 4     The following facts are part of the stipulated record agreed to by both the Union and the CTA for its hearing before an administrative law judge (ALJ).

¶ 5                      i. The Collective Bargaining Agreements

¶ 6     The Union and the CTA were parties to a collective bargaining agreement with a term of January 1, 2007, through December 31, 2011. Article II, section 2.7, of that agreement provided, in pertinent part:

> "2.7 SUBCONTRACTING The Authority shall not subcontract or assign to others work which is normally and regularly performed by employees within the collective bargaining unit of Local 241, except in cases of emergency when the work or service required cannot be performed by the available complement of unit members. The Authority reserves the right to continue its present practice of contracting out certain work of the nature and type contracted out in the past."

The 2007-2011 collective bargaining agreement also provided for a "grievance procedure culminating in final and binding arbitration."

¶ 7     In December 2012, the Union and the CTA signed a tentative agreement for a successor collective bargaining agreement with a stated term from January 1, 2012, through December 31, 2015. The tentative agreement was ratified by both the Union's membership and the Chicago Transit Board that same month. It did not alter the language of article II, section 2.7, as it

appeared in the 2007-2011 collective bargaining agreement and also provided for a "grievance procedure culminating in final and binding arbitration."

¶ 8                              ii. The Open Fare Payment Collection System

¶ 9     According to the stipulated record, beginning in 2009, Chicago newspapers published articles about the development of "a single smart card" for use on the CTA, Pace suburban bus lines, and the Metra commuter rail system. In a press release issued on August 12, 2009, the CTA stated that the transition to the new system "would save the CTA in money now used to issue fare media and manage the fare payment and collection system." The CTA explained that the project would have two phases, stating:

> "The first phase of the procurement process will examine the CTA's options for developing the card—considering possible procedures, management and cost of the program. After reviewing these proposals and developing a final plan, the second phase will give companies the opportunity to submit proposals for the actual implementation of the program."

The CTA concluded that it expected "to complete the two-step RFP process and begin the transition to an open fare system [the following] summer." Later that same month, on August 24, the CTA issued its RFP for the first phase of the project.

¶ 10     On September 28, 2010, the CTA issued a press release, published on its website, stating that it was "preparing the next phase of its move toward an open fare payment [collection] system" and that, on that day, it was "issuing a Request for Proposal *** on the design, implementation, and operation of an open fare [payment] collection system." In its press release, the CTA also indicated that during the "first phase of the bid process, [it] received initial

proposals from 12 private sector teams interested in partnering with the agency on the design, implementation, and operation of an open fare payment collection system."

¶ 11    The CTA's follow-up RFP, titled "Request for Proposals (RFP) Step Two to Provide an Open Fare Payment Collection System," is the RFP that the CTA forwarded to the Union and that the Board found triggered the statute of limitations. The RFP cover page indicated that the CTA was "seeking proposals for the subject project" and that proposals would be accepted until November 5, 2010. The RFP itself was 190 pages and attached 24 appendices totaling over 300 additional pages. Page 23 of the RFP stated, in relevant part, that to achieve its business goals:

> "CTA requires that the Contractor propose a business, technical, and operating solution that would design, finance, acquire, implement, certify, operate, maintain, repair, upgrade, and replace a fully operational [open fare payment collection system], according to the business and technical criteria. Upon full implementation of the [system], *** the Contractor will have full responsibility for successful operation, maintenance, repair and replacement of the [system] including the provision of all required support functions needed to meet the Performance Standards."

The CTA further indicated on page 23 of the RFP that the contractor would supply support functions for the system, including the "[p]rocessing of all payments, electronic and cash, due to CTA from the [system]."

¶ 12    On September 29, 2010, the CTA's then-vice president of human relations, Robert Gierut, mailed a copy of the RFP to the then-president of the Union, Darrell Jefferson. In his letter, Mr. Gierut simply stated that he was "confirm[ing] transmittal of a copy of the *** RFP

for [Mr. Jefferson's] review" and that Mr. Jefferson should "feel free to contact the Project Manager" with any questions about the RFP.

¶ 13                iii. Ventra Implementation and Abolishment of Union Jobs

¶ 14    In July 2011, Public Act 97-85 was enacted, amending section 2.04 of the Regional Transportation Authority Act (70 ILCS 3615/2.04 (West 2010)) to require that the CTA "develop and implement a regional fare payment system" by January 1, 2015. Pub. Act 97-85, § 10 (eff. July 7, 2011).

¶ 15    The Chicago Transit Board enacted ordinance No. 011-143 in November 2011, stating that it had "identified Cubic Transportation Systems Chicago, Inc. as the contractor whose proposal best meets the [CTA]'s requirements to provide the [open fare payment collection system]." Chicago Transit Board Ordinance No. 011-143 (approved Nov. 15, 2011). The ordinance authorized the CTA to enter into a contract with Cubic Transportation Systems. *Id.*

¶ 16    At the same time, the CTA issued a press release about the ordinance, stating that it had "approved an agreement to implement a new, open standards based fare-collection system" and that it had "awarded the $454 million contract to Cubic Transportation Systems." The Chicago Tribune also ran an article that day about the expected approval of the "$454 million, 12-year contract for a new fare-collection system." Jon Hilkevitch, *CTA plan would let riders pay fares with credit cards*, Chi. Trib. (Nov. 15, 2011), http://articles.chicagotribune.com/2011-11-15/news/ct-met-cta-fares-1115-20111115_1_chicago-cards-cubic-transportation-systems-prepaid-cards.

¶ 17    Subsequently, the CTA announced in a press release that Pace would also be taking part in the new fare collection system and had joined the contract with Cubic Transportation Systems. In a September 2012 press release, the CTA and Pace "unveiled Ventra™," the system being

implemented by Cubic Transportation Systems, which the press release described as "a new fare payment system that will provide CTA and Pace customers with a new and more convenient way to pay for train and bus rides." The CTA also stated that transition to the new system for both the CTA and Pace was expected to begin in the summer of 2013, with a system-wide implementation expected by 2014. In the spring and summer of 2013, the CTA held a public hearing and issued another press release about Ventra on its website.

¶ 18    Ventra became operational in September 2013 and, on September 4, 2013, "the CTA for the first time informed the Union that it would be eliminating *** 8 classifications" including "Cashier, Revenue Collector, Fare Media Operations Clerk, Student Riding Pass Representative, Treasury Clerk, Money Handler II, Money Handler IV, and Vault Service Clerk." Those classifications encompassed "24 bargaining unit positions." Since September 4, the duties previously performed by the Union personnel in those 24 positions have been performed by non-Union personnel.

¶ 19    On September 11, 2013, the CTA Committee on Finance, Audit and Budget and the Chicago Transit Board approved the elimination of the eight classifications and the abolishment of the associated 24 bargaining unit positions. That same day, the Chicago Transit Board enacted ordinance No. 013-128 (Chicago Transit Authority Ordinance No. 013-128 (approved Sept. 11, 2013)) which authorized the abolishment of those 24 positions, and the CTA informed the 24 affected employees that their positions were to be eliminated. The Union was given no opportunity to bargain with the CTA about this decision. Although the employees whose positions were eliminated did not ultimately lose employment, "those employees were subject to a loss of pay, changes in work location and schedule, and a loss of seniority rights as it related to picking schedules and vacations in the different classifications."

¶ 20                           B. The Unfair Labor Practice Charge

¶ 21    The Union filed its initial unfair labor practice charge with the Board on September 18, 2013, alleging that the CTA engaged in an unfair labor practice when it informed the Union that "bargaining unit jobs were being 'abolished' as a result of its decision to sub-contract certain fare revenue operations." According to the Union, in taking this action, the CTA failed to provide an opportunity for bargaining over the decision and unilaterally altered "the terms and conditions of bargaining unit members." The Union also alleged that the CTA had "failed and refused to bargain over notices and procedures by which members affected by the abolishments can utilize their [collective bargaining agreement] rights to bump into other positions," had "failed to provide an opportunity to arbitrate the contractual issues," and had taken the above actions in retaliation against the Union.

¶ 22    On April 30, 2014, the executive director of the Board issued a "Complaint for Hearing" (complaint) based on the Union's charge. The complaint alleges that the introduction of Ventra lead to the subcontracting of Union work and the elimination of bargaining unit positions in violation of sections 10(a)(1) and (4) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/10(a)(1), (a)(4) (West 2012)). In January 2015, the parties filed their stipulated record for the hearing before the ALJ.

¶ 23                           C. The Decisions of the ALJ and the Board

¶ 24    In July 2015, the ALJ issued her "Recommended Decision and Order" (recommended decision), finding that (1) the Union's charge with respect to the CTA subcontracting and refusing to bargain about subcontracting was untimely filed, (2) the Union's charge that the CTA violated sections 10(a)(1) and (4) of the Act by eliminating bargaining unit positions without providing the Union notice and an opportunity to bargain was without merit because the CTA

did not have an obligation to bargain on that issue, and (3) the Union's charge that the CTA repudiated the parties' collective bargaining agreement by refusing to arbitrate the Union's subcontracting grievance in violation of sections 10(a)(1) and (4) of the Act was also without merit because a single refusal to arbitrate did not constitute a repudiation of the CTA's bargaining obligations.

¶ 25    In March 2016, the Board adopted the ALJ's recommended decision and, in April 2016, the Union filed its petition for review in this court. The Union in this appeal does not challenge the ALJ's finding that the CTA's single refusal to arbitrate was not a repudiation of the parties' collective bargaining agreement and therefore not a violation of the Act.

¶ 26                                    JURISDICTION

¶ 27    The Board issued and served its final administrative decision on March 11, 2016. The Union timely filed the present appeal on April 15, 2016, within 35 days as permitted by section 11(e) of the Act (5 ILCS 315/11(e) (West 2014)). Accordingly, this court has jurisdiction over this direct appeal from the Board's ruling pursuant to that section, as well as section 3-113 of the Administrative Review Law (735 ILCS 5/3-113 (West 2014)) and Illinois Supreme Court Rule 335 (Ill. S. Ct. R. 335 (eff. Jan. 1, 2016)).

¶ 28                                    ANALYSIS

¶ 29                              A. Standard of Review

¶ 30    Our review of the Board's decision is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2014)). *Clerk of Circuit Court of Lake County v. Illinois Labor Relations Board*, 2016 IL App (2d) 150849, ¶ 25. The Board rendered its decision in this case based on a stipulated record. The parties agree that the question on review is whether the Board's decision was clearly erroneous, requiring the application of undisputed facts to statutory

standards. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 211 (2008). As our supreme court has made clear, a decision of an administrative agency is clearly erroneous, "only where the reviewing court, on the entire record, is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001). However, this deferential standard does not mean that "a reviewing court must blindly defer to the agency's decision." *Id.*

¶ 31　In addition, as the Union argues in its reply brief, there is a legal issue as to whether an employer's request for proposals to subcontract constitutes an unambiguous announcement of an allegedly unlawful transfer of unit work out of the unit. On this legal issue our review is *de novo*. *Samour, Inc. v. Board of Election Commissioners of the City of Chicago*, 224 Ill. 2d 530, 542 (2007).

¶ 32　　　　　　　　　B. The Unfair Labor Practice Charge

¶ 33　The complaint filed based on the Union's unfair labor practice charge alleged that the CTA violated sections 10(a)(1) and (4) of the Act. 5 ILCS 315/10(a)(1), (a)(4) (West 2012). In order to prove a violation of section 10(a)(1), a charging party must establish, by a preponderance of the evidence, that the employer engaged in conduct which reasonably tends to interfere with, restrain, or coerce employees in the free exercise of their rights under the Act. 5 ILCS 315/10(a)(1) (West 2012). Under section 10(a)(4) of the Act, it is an unfair labor practice for a public employer or its agents "to refuse to bargain collectively in good faith with a labor organization which is the exclusive representative of public employees in an appropriate unit." 5 ILCS 315/10(a)(4) (West 2012). If the public employer fails to bargain, it violates not only its duty under section 10(a)(4) but, derivatively, it also violates its duty under section 10(a)(1) of the

Act. *Wheaton Firefighters Union, Local 3706 v. Illinois Labor Relations Board*, 2016 IL App (2d) 160105, ¶ 15. A public employer also violates its obligation to bargain in good faith, and therefore sections 10(a)(1) and (4) of the Act, when it makes a unilateral change in a mandatory subject of bargaining, without granting notice and an opportunity to bargain with its employees' exclusive bargaining representative. See *Central City Education Ass'n, IEA/NEA v. Illinois Educational Labor Relations Board*, 149 Ill. 2d 496, 522 (1992).

¶ 34    The two issues on appeal are (1) whether the Union's charge was timely filed pursuant to the Act as to the CTA's decision to subcontract bargaining unit work and (2) whether the CTA violated the Act by eliminating bargaining unit positions without providing the Union with notice and the opportunity to bargain. We consider each issue in turn.

¶ 35                        i. Timeliness of the Charge as to Subcontracting

¶ 36    We first consider the timeliness of the Union's charge alleging that the CTA violated the Act by unilaterally transferring bargaining unit work to nonunit employees and repudiated the parties' agreement by subcontracting that work out to a third party. The Board ruled that these claims were untimely because the six-month limitations period was triggered when the CTA sent a copy of the second stage RFP to the Union's president on September 29, 2010; the Union did not file its charge until September 18, 2013. However, the Union argues that sending it a copy of the RFP was insufficient to trigger the statutory time period for filing a charge.

¶ 37    Section 11 of the Act provides that, whenever an unfair labor practice is charged, "the Board *** shall conduct an investigation of the charge" "*provided that no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of a charge* with the Board." (Emphasis added.) 5 ILCS 315/11(a) (West 2012).

¶ 38     Under Illinois law, "the time for filing an unfair labor practice charge begins to run when the aggrieved party becomes aware, or should become aware, of a change in personnel policy that is 'unambiguously announced.' " *Water Pipe Extension v. City of Chicago*, 206 Ill. App. 3d 63, 68 (1990) (quoting *Wapella Education Ass'n, IEA-NEA v. Illinois Educational Labor Relations Board*, 177 Ill. App. 3d 153, 168 (1988)). The question as to whether an employer issuing an RFP constitutes the requisite "unambiguous announcement" is, as the parties recognize, an issue of first impression both for the Board and for this court.

¶ 39     In the Board's view, the Union's awareness of an employer's request for proposals or solicitation of bids is sufficient to trigger the time for filing the charge, unless there are circumstances that demonstrate the request or solicitation does *not* represent a definite decision by the employer to subcontract the work. As the ALJ stated in her recommended decision, which the Board affirmed, "[a]s a general matter, an employer's notice to a union that it seeks to solicit bids from contractors to perform bargaining unit work constitutes an unambiguous announcement of an allegedly unlawful transfer of unit work out of the unit" (citing *Manhasset Educational Support Personnel Ass'n*, 41 PERB ¶ 3005 (N.Y. Pub. Emp't Relations Bd. 2008)).

¶ 40     The Board relies on two decisions from the state of New York to support its position. In *Manhasset*, the New York Public Employment Relations Board (New York PERB) held that a union's time for filing its charge against a school district was not triggered by the school district's commencement of a bid solicitation process for "the possible outsourcing" of the school district's program for transporting students. *Id.* The New York PERB noted that, six years previously, the school district had solicited bids but decided against subcontracting and, instead, decided to " 'check the market every four or five years' in order to determine whether it should modify the means of delivering student transportation services." *Id.* The New York PERB in

*Manhasset* also relied on the fact that the union and the school district were still engaged in "good faith negotiations on the decision to subcontract." *Id.*

¶ 41    The New York PERB in *Manhasset* followed the reasoning of the intermediate appellate court of that state in *In re Board of Education of Union-Endicott Central School District*, 681 N.Y.S.2d 391 (App. Div. 1998), upon which the Board in this case also relies. There, the court held that the unfair labor practice claim at issue did accrue at the time a school district began soliciting bids for bargaining unit work and set forth a test, stating:

> "The key to ascertaining a claim's accrual date is to look at the crux of the challenge being asserted. [Citation.] In this case, the union has no quarrel with the overall bidding process, the actual awarding of the bid or the terms of the contract ultimately entered into. It cares not what contractor is doing the work or on what terms; rather, its complaint is that the work is not being done by School District employees represented by the union. Thus viewed, it becomes apparent that the key event was petitioner's decision to put the work out to bid, made in September 1992. At that point (to the extent that it ever could be), the damage to the union employees was readily ascertainable." *Union-Endicott*, 681 N.Y.S.2d at 394.

The PERB in *Manhasset* distinguished the facts of *Union-Endicott*, noting that *Union-Endicott* did not involve the school district soliciting bids merely "to test the private sector market" nor parties that were involved in good faith negotiations over the decision to subcontract "both before and after the commencement of the bid solicitation process." *Manhasset*, 41 PERB ¶ 3005.

¶ 42    In the present case, the ALJ found on the stipulated record that "the CTA established no pattern of declining to subcontract after soliciting bids, such that the solicitation of bids would be

inadequate notice of the CTA's decision to subcontract." The analysis advanced by the Board in this case, following these New York cases, is that the Union's awareness that there has been an RFP is generally sufficient to trigger the time to file a charge, unless, as in *Manhasset*, there are circumstances to suggest that the employer is simply "checking the market" and is not genuinely intending at that time to subcontract bargaining unit work.

¶ 43    The Board urges us to adopt the rule followed in New York and points out that, in contrast to the situation in *Manhasset* and a case on which the Union relies that we discuss below, *California School Employees Ass'n*, Decision No. 1440 (Cal. Pub. Emp't Relations Bd. 2001), http://www.perb.ca.gov/decisionbank/pdfs/1440.pdf (*Lucia Mar*), there is no history in this case demonstrating that the CTA's RFP was not intended to be a true solicitation of bids or that the CTA was simply checking the market and had not yet made a final decision to subcontract. The Board also makes a policy argument that, if a union was able to wait until the employer actually implements its decision to subcontract by awarding the contract, the parties would lose any opportunity to meaningfully discuss cost saving alternatives to outsourcing after an unfair labor practice charge has been filed.

¶ 44    In contrast, the Union's position is that the CTA's RFP was not an unambiguous announcement of its intention to subcontract bargaining unit work. In its brief, the Union initially relied on *Metropolitan Alliance of Police, Chapter 351*, 30 PERI ¶ 116 (ILRB State Panel 2013), to suggest that the statutory limitations period for filing a charge of unfair labor practices is not triggered until an employer actually *implements* the decision to subcontract, rather than when it announces its intent to do so. However, the Union backed away from that position at oral argument, instead simply arguing that the RFP did not constitute an unambiguous announcement by the CTA.

¶ 45    The Union relies on *Lucia Mar*, *supra* ¶ 43, where the California Public Employment Relations Board (California PERB) held that a request for proposals did not trigger the statute of limitations. In *Lucia Mar*, however, the ALJ specifically noted in his decision, which was adopted by the California PERB, that "[a]t the same time the board approved the RFP, it also created a new Ad Hoc Committee 'to study the pros and cons of contract busing.' " *Lucia Mar*, *supra* ¶ 43, app. ("Proposed Decision" at 25). Thus, as the Board points out, *Lucia Mar* included facts that showed the request for proposals did not represent a final determination by the employer to subcontract. The Union insists, however, that such facts are likewise present in this case. Specifically, the Union points to the fact that, in its RFP, the CTA stated that it reserved the right to "accept or reject any or all Proposals" and to "refuse to enter into any Agreement resulting from any Proposal submitted."

¶ 46    Considering all of the above, we reject the Union's argument that the decision to subcontract must actually be implemented in order to trigger the time to file a charge. The law in Illinois is clear that the change in policy that the Union alleges was an unfair labor practice does not need to have been implemented. Rather, the limitations period begins to run when the charging party becomes aware of, or should have become aware of, a decision by the employer that it will implement a change in policy. This occurs on the date that the decision is " 'unambiguously announced' " and may occur prior to the date that the change in policy is implemented. *Water Pipe Extension*, 206 Ill. App. 3d at 68 (quoting *Wapella*, 177 Ill. App. 3d at 168).

¶ 47    In *Wapella*, for example, the court found that the time for the union to file its charge was triggered when a school district announced a change in policy regarding granting full credit on its salary schedule for teaching experience in other districts. *Wapella*, 177 Ill. App. 3d at 168. As

the court explained, "the claimed unfair labor practice is the unilateral change in policy not its application to particular individuals *per se*." *Id.* In contrast, the court in *Water Pipe Extension* found that the time for filing an unfair labor practice charge was not triggered when the city in that case initially informed a union that certain members of the union had been reclassified. *Water Pipe Extension*, 206 Ill. App. 3d at 68-69. In making its determination, however, the court relied on the union's allegation that "it did not receive unambiguous notice" that the reclassifications at issue were done pursuant to a particular personnel rule until December 1986. *Id.* at 65, 68-69. Because the unfair labor practice charge was based on the city having misled the union to believe that the city had not and would not apply that personnel rule to its members, the court found that the union's May 1987 charge was timely filed pursuant to the Act. *Id.* at 65, 69. The analysis in both *Wapella* and *Water Pipe Extension* demonstrates that actual implementation of a new policy is not required to trigger the time for filing an unfair labor practice charge.

¶ 48    *Metropolitan Alliance of Police*, 30 PERI ¶ 116, on which the Union relies, is not to the contrary. Although there is language in that decision stating that "there is no evidence that the Village unilaterally *implemented* a change in terms and conditions of employment," the Village in that case was "simply considering" the option of outsourcing telecommunications services. (Emphasis added) *Id.*

¶ 49    However, we also reject the Board's determination that the kind of implicit "announcement" that occurred in this case—delivery of a lengthy RFP to the Union, accompanied by a cover letter that indicated nothing beyond the fact that the RFP was enclosed—is sufficient to constitute the required "unambiguous announcement" for triggering the limitations period. We find significant the CTA's choice to say absolutely nothing in the cover letter about its ultimate intention, when it could have used that letter to explicitly announce

its decision to subcontract bargaining unit work. Such an announcement would have been the kind of "unambiguous" and explicit notice that is, in our view, required to trigger the Union's obligation to file a charge.

¶ 50    While the CTA certainly made no secret of the Ventra program, we believe it is simply unfair to ask a union—or, for that matter, the Board or the courts—to divine what an employer's intent is when the employer chooses not to state that intent explicitly and directly to the union. Indeed, the factual distinctions that the New York PERB was required to draw between *Manhasset* and *Union-Endicott* reflect the kind of after-the-fact line drawing that creates unpredictability. In *Manhasset*, the RFP was not sufficient to trigger the statute despite the employer's claim that it reflected a "final decision" to subcontract because, six years earlier, the school district had solicited bids and then decided against subcontracting. *Manhasset*, 41 PERB ¶ 3005. The New York PERB in that case had to decide, in hindsight, what the school district's intent was at the time it solicited bids. The rule that the Board applied here, which was adopted by the New York PERB and intermediate appellate court of New York, requires the Union to do this kind of employer mind reading at its peril. We are not convinced this is necessary. Instead, an employer should be required to expressly and explicitly announce its intentions to subcontract in order to trigger the time for filing an unfair labor practice charge.

¶ 51    As the National Labor Relations Board has recognized, "[t]he required adequate notice to start the tolling of the statute is not a matter of 'hare and hound' decipher play, but of required unequivocal notice. To allow for less is to necessarily weaken collective bargaining." *Land Air Delivery, Inc.*, 286 N.L.R.B. 1131, 1155 (1987). Requiring explicit notice protects the unions, the Board, and the courts from having to second-guess what an employer's intentions were when it issued a request for proposals or solicited bids. Requiring an explicit announcement also

avoids any gamesmanship by an employer who might hope that a union will not recognize that a request for proposals is intended to be the announcement of a decision by the employer to subcontract bargaining unit work. At the same time, once the employer unambiguously and expressly announces that it intends to subcontract, the union and the employer still could have time to engage in meaningful negotiations before a subcontract has been entered into.

¶ 52     Of course the New York cases are not controlling here. See *U.S. Residential Management & Development, LLC v. Head*, 397 Ill. App. 3d 156, 164 (2009) (noting that the holdings from other jurisdictions are not binding on this court). In addition, we note that the statute relied upon in the New York cases is different than the statute that controls in Illinois. Compare N.Y. Educ. Law § 3813(1) (McKinney 1992) ("No action or special proceeding *** shall be prosecuted or maintained *** unless it shall appear *** that a written verified claim upon which such action or special proceeding is founded was presented to the governing body of said district or school within three months *after the accrual* of such claim ***." (Emphasis added.)) with 5 ILCS 315/11(a) (West 2012) ("provided that no complaint shall issue based upon any unfair labor practice *occurring* more than six months prior to the filing of a charge with the Board" (emphasis added)). Indeed, the court in *Union-Endicott* expressly relied on the unusual triggering language in the New York statute that required the union to give notice to the employer within three months of "the accrual" of a claim, noting that "claim accrued" is "not synonymous with the terms 'cause of action accrued' [citation]," and that "a claim can accrue far earlier than a cause of action based on the same underlying subject matter." *Union-Endicott*, 681 N.Y.S.2d at 394.

¶ 53     In sum, although the CTA surely could have made an express and unambiguous announcement to the Union that it intended to subcontract bargaining unit work, it did not do so. Until the CTA notified the 24 bargaining unit employees that their positions were eliminated on

September 11, 2013, the Union did not have the unambiguous explicit notice that we find is necessary to trigger the six-month period in which to file a charge pursuant to the Act. Therefore, the charge that the Union filed on September 18, 2013, was timely as to its claims that the CTA committed an unfair labor practice by subcontracting bargaining unit work and by repudiating the parties' collective bargaining agreement in doing so.

¶ 54                              ii. The Elimination of Bargaining Unit Positions

¶ 55    We now turn to the Union's charge that the CTA committed an unfair labor practice by eliminating 24 bargaining unit positions without providing the Union with notice and an opportunity to bargain. The Board found the charge was timely with respect to this issue because the trigger for the limitations period did not occur until the 24 bargaining unit employees were notified that their positions were eliminated on September 11, 2013, and the charge was filed a week later. However, the Board also adopted the ALJ's ruling that the elimination of these positions was not a mandatory subject of bargaining and that the CTA was therefore entitled to eliminate these positions without providing the Union with either prior notice or an opportunity to bargain.

¶ 56    In making this determination, the ALJ used the three-part test from *Central City*:

> "The first part of the test requires a determination of whether the matter is one of wages, hours and terms and conditions of employment. This is a question that the [board] is uniquely qualified to answer, given its experience and understanding of bargaining in education labor relations. If the answer to this question is no, the inquiry ends and the employer is under no duty to bargain.
>
> If the answer to the first question is yes, then the second question is asked: Is the matter also one of inherent managerial authority? If the answer to the

- 18 -

second question is no, then the analysis stops and the matter is a mandatory subject of bargaining. If the answer is yes, then the hybrid situation discussed in section 4 exists: the matter is within the inherent managerial authority of the employer and it also affects wages, hours and terms and conditions of employment.

At this point in the analysis, the [board] should balance the benefits that bargaining will have on the decisionmaking process with the burdens that bargaining imposes on the employer's authority. Which issues are mandatory, and which are not, will be very fact-specific questions, which the [board] is eminently qualified to resolve." *Central City*, 149 Ill. 2d at 523.

¶ 57 The ALJ first found, and both parties agree, that the elimination of positions was a matter "of wages, hours and terms of conditions of employment." Although the CTA rescinded its initial decision to terminate the 24 employees whose positions were impacted, instead transferring them to other positions, those employees lost pay and seniority rights, and their work locations and schedules changed. The employees' wages, hours, and the terms and conditions of their employment were clearly impacted.

¶ 58 In response to the second *Central City* question, the ALJ also found that the elimination of those positions was a matter of "inherent managerial authority" because it was a part of the CTA's broader decision to bring about a legitimate reorganization and, more specifically, because the Ventra program was a change in the nature or essence of the services that the CTA provides. The Union, however, disputes this finding on several bases.

¶ 59 First, the Union argues that the CTA waived any right to claim that it has inherent managerial authority to subcontract because it agreed to section 2.7 of the parties' collective

bargaining agreement, which states that the CTA will "not subcontract or assign to others work which is normally and regularly performed by employees within the collective bargain unit," except in cases of emergency. The ALJ did not address this argument in her recommended decision, the Board did not address it in its decision, and the Board barely addresses this argument on appeal, except to argue that any claim about subcontracting was not timely filed. We believe that the Board is better equipped than we are to address this waiver argument in the first instance and should do so on remand.

¶ 60    The Union also challenges the Board's determination that the CTA's decision to eliminate positions was "a matter of inherent managerial authority because it was part of the CTA's broader decision to effect a legitimate reorganization" as clearly erroneous. We will address this argument because it is likely to reoccur on remand. See *Central City*, 149 Ill. 2d at 524 ("Issues have been raised in these causes which are likely to reappear on remand, and in the interest of judicial economy the court will examine them now.").

¶ 61    In order to establish that an employer's action was a legitimate reorganization and, as such, a matter of inherent managerial authority, that employer must show:

> "(1) that its organizational structure has been fundamentally altered; (2) that the nature or essence of the services provided has been substantially changed; or (3) that the nature and essence of a position has been substantively altered such that the occupants of that position no longer have the same qualifications, perform the same functions, or have the same purpose or focus as had the previous employees." *American Federation of State, County & Municipal Employees, Council 31*, 17 PERI ¶ 2046 (ISLRB 2001).

"Absent such a basic or substantial change to the Employer's organizational structure or services provided, or to a fundamental essence of a position, we will not find an employer's decision a matter of inherent managerial authority." *Id.*

¶ 62    The ALJ agreed with the Union that the CTA met neither the first nor the third part of the test. She noted that the simple elimination of titles that performed related duties, while the rest of the organization remained unchanged, did not constitute a fundamental alteration of the organizational structure (citing *American Federation of State, County & Municipal Employees, Council 31*, 28 PERI ¶ 67 (ILRB, State Panel 2011); *Peoria Firefighters Ass'n, Local 544*, 3 PERI ¶ 2025 (ISLRB 1987)). In addition, she observed that the CTA did not make substantive alterations to any positions "because both the eliminated positions and the successor positions perform fare collection duties" and, accordingly, the installation of the new fare collection equipment was irrelevant (citing *Teamsters, Local Union No. 714*, 12 PERI ¶ 3021 (ILLRB 1996)).

¶ 63    With respect to the second part of the test for determining whether an employer's action was a legitimate reorganization, however, the ALJ found that the CTA *did* substantially change the nature or essence of the services it provides and that the elimination of the 24 positions was a part of that change. As she stated in her recommended decision, "[a]n employer changes the nature and essence of its services when it alters the manner in which it communicates with the public and changes the way it provides its existing services" (citing *American Federation of State, County & Municipal Employees, Council 31*, 29 PERI ¶ 162 (ILRB State Panel 2013)). The ALJ observed that, here, the CTA changed the services it provides to the public because the new system "increas[ed] the ease with which customers paid for their fares and entered its mass transit system" by "allow[ing] customers to pay for fares using credit/debit cards instead of

relying on CTA issued tickets, and permit[ing] 'tap and go' entrance to CTA mass transit instead of requiring customers to slip their cards into card readers." She noted that the "CTA effectuated these improvements to its services by delegating the entire fare collection process *** to an outside contractor and, in turn, eliminating the unit positions that performed fare collection under the antiquated system." The ALJ concluded that, based on the above, the CTA had "fundamentally changed the way it provided *** mass transit services to its customers," and therefore the CTA showed that its action was a legitimate reorganization and a matter of inherent managerial authority. See *American Federation of State, County & Municipal Employees, Council 31*, 17 PERI ¶ 2046 (ISLRB 2001). The ALJ's conclusions and reasoning on this subject were adopted by the Board.

¶ 64   We do not find these conclusions or this reasoning to be clearly erroneous. The Union argues that the ALJ was incorrect in her conclusion that Ventra represented a change because it allowed customers to enter the system more rapidly via a "tap and go" process, insisting that the CTA's prior fare system already provided for "tap and go." In support of its argument, the Union cites a newspaper article that says "tap and go" existed before Ventra, which does not convince us that the ALJ's finding was "clearly erroneous." Moreover, even if, as the Union argues, the only change brought by Ventra was moving from a "closed" system, which only allowed customers to access the CTA, to the "open" Ventra system, which allows customers, through a single card, to pay their fares and access the metropolitan mass transit system, including suburban bus lines and regional commuter rail, this change would be sufficient to support the ALJ's conclusion that there was a "legitimate and significant change" in the way services are provided. As such, it was not clearly erroneous for her to find that the CTA was exercising inherent managerial authority when it eliminated the 24 positions as part of bringing in Ventra.

Therefore, unless the Board finds on remand that the CTA has waived any managerial authority over this issue, it must proceed to the third part of the *Central City* test in which it balances the benefits that bargaining will have on the decision making process with the burdens that bargaining imposes on the employer's authority.

¶ 65    The ALJ's application of the third part of the *Central City* test in this case rested, in significant part, on her belief that "[t]he usual benefits of bargaining over the elimination of unit positions do not exist in this case where the CTA's action is simply the final step of a broader change that the Union failed to timely protest." Although this made sense in the context of her recommended decision, we have found that the Union's protest was, in fact, timely as to subcontracting as well as to the elimination of positions. Therefore, if the third part of the test is reached again on remand, this analysis must be reexamined.

¶ 66    The Union urges us to not remand this case but to instead make a finding that the CTA committed an unfair labor practice and order the CTA to bargain with the Union over its decision to subcontract and eliminate bargaining unit work. However, we will not, in this first instance, determine the merits of the Union's claims. Rather, we have found that (1) the claims in reference to subcontracting were timely and should be addressed on the merits, and that (2) the Board's determination that the elimination of positions was not a mandatory subject of bargaining was flawed, both to the extent that it ignored the Union's argument that the CTA waived the right to subcontract and to the extent that the balancing aspect of the *Central City* test rested on the view that the subcontracting charge was untimely. Accordingly, we remand for further consideration of these issues by the Board.

¶ 67                                   CONCLUSION

¶ 68    For the foregoing reasons, we reverse the decision of the Board and remand for further

proceedings consistent with this opinion.

¶ 69    Reversed and remanded.